Paul J. HAGEN, Plaintiff,

v.

BURMEISTER & ASSOCIATES, INC.,
Defendant and Third–Party
Plaintiff, Respondent,

v.

American Agency, Inc., Third–Party
Defendant, Petitioner,
Appellant.

No. C3–00–496.

Supreme Court of Minnesota.

Aug. 2, 2001.

Rehearing Denied Sept. 27, 2001.

Joseph M. Sokolowski, David A. Orenstein, Parsinen Kaplan Rosberg & Gotlieb, P.A. and Leon R. Erstad, Erstad & Riemer, P.A., Minneapolis, for the appellant.

Eric J. Magnuson, Kimberly T. Ross, Rider, Bennett, Egan & Arundel, LLP, Minneapolis, and Rodney J. Mason, Chandler and Mason, Ltd., St. Paul, for respondent.

## OPINION

LANCASTER, Justice.

A trial court held that insurance agent Paul Hagen was liable to his former employer, respondent Burmeister & Associates, Inc., for breach of contract and for misappropriation of trade secrets in violation of the Minnesota Uniform Trade Secrets Act (UTSA). The trial court also held that Hagen's current employer, appellant American Agency, Inc., was not vicariously liable to Burmeister for Hagen's UTSA violation because an employer cannot, as a matter of law, be vicariously liable for an employee's UTSA violation. Burmeister appealed that holding and the court of appeals reversed, concluding that an employer can be liable for an employee's UTSA violation. The court of appeals remanded the case for further findings to determine whether Hagen's UTSA violation fell within the scope of his employment with American. On remand, the district court granted summary judgment for American, and Burmeister appealed for the second time.[1] The court of appeals again reversed. This case comes before us on American's appeal of that decision. We reverse.

Paul Hagen is an experienced insurance agent who specializes in selling property and casualty insurance. In October 1991, respondent Burmeister & Associates, Inc. (Burmeister), whose sole shareholder and president is Randall Burmeister (Mr. Burmeister), purchased the assets of Hagen's insurance agency, the Hagen Agency, Inc. Those assets included the Hagen Agency's insurance contracts and information about the agency's policyholders. Three documents were executed in connection with that sale: an asset purchase agreement; a

---

1. For clarity, we will refer to the court that presided over the trial as the trial court, and the court that, on remand, granted American's motion for summary judgment as the district court.

consulting, confidentiality, and noncompetition agreement; and a producer agreement. After the sale, Hagen went to work for Burmeister as an independent contractor, but later became an employee. The noncompete and confidentiality agreement Hagen signed with Burmeister prohibited the disclosure of information relating to Burmeister's policyholders, which, according to the agreement, was "deemed to be 'trade secrets' within the meaning of the Minnesota Uniform Trade Secrets Act." Pursuant to the agreement, Hagen agreed that if and when he left Burmeister's employ he would not sell or issue property or casualty insurance to Burmeister customers, including the Hagen Agency's customer accounts sold to Burmeister in 1991, until February 28, 2001.

In November 1994, while still a Burmeister employee, Hagen met Steven Menefee, an insurance agent and branch manager of American Agency, Inc. Hagen contacted Menefee and had a series of meetings with him and other American representatives to explore employment opportunities with American. During these meetings, Hagen told American about the noncompete and confidentiality agreement he entered into with Burmeister. On January 17, 1995, Hagen resigned from Burmeister.

Shortly before Hagen resigned, Mr. Burmeister and Hagen discussed the client accounts that Hagen sold to Burmeister in 1991. Mr. Burmeister said something to the effect that he would understand if Hagen's close family and friends kept their business with Hagen, but if he tried to take 90% of the client accounts he sold to Burmeister, they would have a problem. Approximately one week later, Hagen went to work for American.[2] After Hagen left Burmeister, but before he joined American, he described his parting from

Burmeister to Menefee. Menefee understood that Hagen "had a good exit interview and that he was free to solicit some of the accounts * * *."

On January 29, 1995, Hagen, now working for American, sent out a solicitation letter to more than 200 Burmeister customers from among the accounts he sold to Burmeister in 1991. Those 200 customers accounted for 20 to 30 percent of the accounts Hagen sold to Burmeister. Menefee did not read the final version of the solicitation letter, but did review a rough draft. Additionally, Menefee gave Hagen access to, and Hagen used, American Agency stationery and envelopes to send the letter. Menefee did not, however, monitor the number of letters sent out or to whom those letters were sent.

After Mr. Burmeister learned of the solicitation letter, Burmeister's attorney sent Hagen a letter notifying him that, in Burmeister's view, he was in violation of his noncompete agreement. A few days later, on February 6, Hagen filed an action against Burmeister seeking a declaratory judgment that he was not prohibited from competing with Burmeister. About this time, Menefee contacted Mr. Burmeister to discuss the letter from Burmeister's attorney. Menefee agreed on behalf of American that it would not accept any business from Burmeister clients until the parties could meet and discuss the situation. Shortly thereafter, Hagen, Mr. Burmeister, Menefee and others met and agreed to send out a joint letter to the clients who received Hagen's solicitation letter, informing them that they "have a right to select the insurance agent of their choice." The parties interpreted the significance and effect of this agreement differently: Menefee came away from the meeting feeling that any conflict was es-

---

**2.** American made no job offer to Hagen until he left Burmeister.

sentially resolved, whereas Mr. Burmeister merely viewed the meeting and agreement to send out the joint letter as "damage control," not affecting his legal options. After the meeting and based on his understanding of its resolution, Menefee permitted Hagen to transfer business from clients who had received his solicitation letter.

■ Burmeister filed its answer to Hagen's declaratory judgment complaint and asserted counterclaims of breach of contract, unjust enrichment, and misappropriation of trade secrets. Subsequently, Burmeister filed a third-party complaint against American, claiming tortious interference with contract. Notwithstanding this claim, Burmeister's theory of recovery against American evolved throughout the proceedings into a respondeat superior claim: Burmeister argued the respondeat superior claim at trial and both parties briefed the trial court on that claim. American never challenged Burmeister's change in recovery theories. Accordingly, we will treat the respondeat superior claim as if it had been pled. Minn. R. Civ. P. 15.02; *see T.W. Sommer Co. v. Modern Door & Lumber Co.,* 293 Minn. 264, 269, 198 N.W.2d 278, 281 (1972) (stating that issues litigated either by express or implied consent are treated as if they had been pled).

After a four-day bench trial in August 1996, the court held that Hagen was liable for breach of contract, concluding that Hagen violated the noncompete clause when he sent the solicitation letter to Burmeister clients. Additionally, the court held that Hagen "misappropriated trade secrets as defined in Minn.Stat. [§ 325C.01] when he improperly solicited customers in violation of the Contracts." The court awarded damages to Burmeister "for [Hagen's] misappropriation of Trade Secrets at $28,000 per year for a six year period from January 1995 to February 2001 * * *." With regard to Burmeister's third-party claims against American, however, the court held in favor of American:

> Defendant American Agency is not liable for violating the Minn.Stat. [§ ] 325[C].01 because [the] Minnesota Trade Secrets Act does not permit recovery against an employer when its employees misappropriate trade secrets. Defendant Burmeister's claim that [third-party] Defendant American is liable under a common law tort theory of responde[a]t superior is unsupported by law. Moreover, this Court has found that Defendant [American] did not know, and had no reason to know, that Plaintiff [Hagen] had not agreed upon a permitted use of [the confidential client list] with Defendant Burmeister * * *. Defendant American Agency erroneously, but not culpably, believed that Plaintiff [Hagen] and Defendant Burmeister had reached an agreement on [Hagen's] use of [the client information].

Burmeister appealed to the court of appeals and argued that the trial court erroneously ruled that American was not vicariously liable for Hagen's breach of contract or for his misappropriation of trade secrets. *Hagen v. Burmeister & Assocs., Inc.,* No. C8–98–864, 1999 WL 31130, at *2 (Minn.App. Jan.26, 1999) (*Hagen I*). American also filed a notice of review in connection with the trial court's decision. In its statement of the case, American proposed that the court of appeals review whether the client list used by Hagen to send out his solicitation letters was in fact a trade secret. A review of the record reveals no subsequent document, including the appellate briefs, where American made any argument to the court of appeals regarding whether the client list was a trade secret.

In *Hagen I*, the court of appeals held that American was not liable under respondeat superior for Hagen's breach of contract because respondeat superior generally applies to tortious conduct committed by employees, and there was no independent tortious conduct committed by American. *Id.* at *2–3. However, the court also held that the trial court erred in concluding that, as a matter of law, American could not be liable for Hagen's violation of the UTSA. *Id.* at *4. The court of appeals held that the misappropriation of trade secrets is an intentional tort, that respondeat superior can apply to tortious acts committed by employees, and therefore "the general rule for vicarious liability should apply to trade secret torts." *Id.* at *3, *4. The court remanded on this issue and stated that "[a]n essential element on retrial will be a factual determination on whether Hagen was acting within the course and scope of his new employment when he mailed his solicitation letter to individuals listed on the confidential customer list." *Id.* at *4. Neither Burmeister nor American sought review of this decision.

On remand, American and Burmeister filed cross-motions for summary judgment. American argued, among other things, that Hagen was not acting within the scope of employment when he violated the UTSA because it was not reasonably foreseeable that Hagen would misappropriate trade secrets. However, American also raised an alternative, contract-based argument:

> [The trial judge's] conclusion that Hagen misappropriated trade secrets in violation of the [U]TSA appears to have been based, not upon the [U]TSA, but upon a contract between Burmeister & Associates, Inc. and Hagen that "deemed" the information that Hagen misappropriated to be "trade secrets" under the [U]TSA. Accordingly, the court need look no further for grounds to grant this summary

judgment motion because an employer cannot be liable under the doctrine of respondeat superior for an employee's breach of contract.

In November 1999, the district court granted American's motion for summary judgment, holding that Hagen did not act within the scope of employment because American did not authorize or ratify his actions and because no evidence demonstrated that misappropriation of trade secrets is a well-known industry hazard. The district court did not rule on American's alternative argument. Burmeister appealed and the court of appeals again reversed, holding that Hagen was acting within the scope of his employment with American when he violated the UTSA. *Hagen v. Am. Agency, Inc.*, 617 N.W.2d 799, 804–05 (Minn.App.2000) (*Hagen II*). This case is currently before us on American's appeal of the *Hagen II* decision.

As a preliminary matter, we address American's alternative, contract-based argument. As it contended in its motion for summary judgment, American argues to this court that the trial court did not analyze Hagen's misconduct under the UTSA elements of a trade secret, but relied on language in Hagen's contract that "deemed" customer information to be a trade secret. Consequently, American contends, Hagen's direct liability was based only on his violation of the noncompete agreement, not on any UTSA violation. Because an employer can only be vicariously liable for an employee's torts, not contract violations, and because Hagen's liability is based only on his contract violation, American argues that it cannot be vicariously liable as a matter of law. Burmeister responds that American no longer has the right to challenge the trial court's holding that Hagen violated the UTSA. Specifically, Burmeister complains

that after the trial and after the *Hagen I* decision, American did not appeal the ruling that Hagen violated the UTSA and therefore failed to preserve its right to challenge that issue on review.

We interpret American's argument not as a challenge to the conclusion of the courts below that Hagen violated the UTSA, but that because that conclusion was based on Hagen's breach of contract, any vicarious liability based on the UTSA violation in effect would be based on breach of contract. American further argues that the result of the court of appeals' ruling, if upheld, would be that vicarious liability is now available for breach of contract.

First, we reject the argument that the court of appeals' ruling makes vicarious liability available based on breach of contract. The court of appeals in *Hagen I* held to the contrary, 1999 WL 31130, at *3, and neither party challenges that holding today. Nothing in the appeal following remand changes that reiteration of the law.

 Second, to the extent that American is arguing that vicarious liability for a UTSA violation cannot be found where the underlying conduct is a breach of contract, we again disagree. As the court of appeals stated in *Hagen I*, misappropriation of trade secrets is an intentional tort. 1999 WL 31130, at *3; *see Micro Data*

*Base Sys., Inc. v. Dharma Sys., Inc.,* 148 F.3d 649, 654 (7th Cir.1998) (noting that misappropriation of trade secrets is an intentional tort); *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.,* 42 F.3d 1292, 1295 (9th Cir.1994) (noting that misappropriation of trade secrets is a tort claim); *World Wide Prosthetic Supply, Inc. v. Mikulsky,* 631 N.W.2d 253, 256 (Wis.Ct. App.2001) (stating that misappropriation of trade secrets in violation of the Wisconsin UTSA is a tort); *see also Electro–Craft Corp. v. Controlled Motion, Inc.,* 332 N.W.2d 890, 898–99 (Minn.1983) (tracing the history of the common law claim of misappropriation of trade secrets, and noting that this court adopted the Restatement of Torts four-prong test for determining whether information is a trade secret). Tortious conduct can provide the basis for vicarious liability. *E.g., Fahrendorff v. North Homes, Inc.,* 597 N.W.2d 905, 910 (Minn.1999). Assuming for purposes of this case that there can be vicarious liability for violation of the UTSA,[3] we reject American's argument that we should look behind the finding of violation to determine whether the conduct on which it is based should be viewed as a tort or a contract breach.[4]

Having rejected American's alternative, contract-based argument, we turn to the merits of Burmeister's vicarious liability claim. The fundamental question before

---

**3.** The UTSA was enacted in 1980. It "displace[s] conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Minn.Stat. § 325C.07(a) (2000). We have not had the opportunity to interpret the meaning of section 325C.07(a).

**4.** A party against whom vicarious liability for a UTSA violation is asserted may, at the appropriate stage of the litigation, challenge whether the conduct was sufficient to prove a violation of the UTSA, but we do not understand American to be making such a challenge here. Indeed, in the first appeal to the court of appeals, American filed a notice of review and, in its statement of the case, asked for review on whether the list of clients used by Hagen was a trade secret and could therefore provide a basis for a UTSA violation. American abandoned that issue, however, by not briefing it in the appeal. *See Balder v. Haley,* 399 N.W.2d 77, 80 (Minn.1987) (noting that an argument is deemed waived if a party fails to brief it).

us is whether Hagen acted within the scope of employment when he violated the UTSA. Before we reach that question, we stress that we will assume for purposes of this decision that an employer can, as a matter of law, be vicariously liable for an employee's UTSA violation, as was decided in *Hagen I*, 1999 WL 31130, at *4. Neither party challenged that legal conclusion after *Hagen I*, the issue has never been thoroughly briefed by the parties, and neither party raises the issue before us now. Therefore, our analysis of the narrow legal issue before us occurs against the backdrop of our acceptance—for this case only—of the proposition that there is no legal prohibition to vicarious liability for UTSA violations.

■ Respondeat superior liability is not based on fault of the employer, but rather is imposed based on a policy choice that liability for acts committed within the scope of employment ought to be allocated to employers as a cost of doing business. *Fahrendorff*, 597 N.W.2d at 910. Respondeat superior represents a compromise between two competing policies. On the one hand, we seek to protect and/or compensate those harmed as a result of some business-related activity. On the other hand, we are hesitant to impose liability on an employer not directly at fault for the act that caused the harm. The general policy, then, is that we will not impose such liability unless there is some connection between the tort and the business such that the employer in essence assumed the risk when it chose to engage in the business. *See Lange v. Nat'l Biscuit Co.,* 297 Minn. 399, 403, 211 N.W.2d 783, 785 (1973). That connection is the basis for the scope of employment test outlined below. *Fahrendorff*, 597 N.W.2d at 912.

■ In analyzing whether Hagen acted within the scope of employment when he violated the UTSA, the district court and

court of appeals applied the scope-of-employment test as enunciated in *Kasner v. Gage,* 281 Minn. 149, 152, 161 N.W.2d 40, 42 (1968). More recently, however, we have followed the scope-of-employment test as clarified in *Lange. Fahrendorff*, 597 N.W.2d at 910. Pursuant to that test, an employer is vicariously liable for an employee's intentional tortious acts when: (1) the tort is related to the employee's duties; and (2) the tort occurs within work-related limits of time and place. *Id.* (citing *Lange,* 297 Minn. at 404, 211 N.W.2d at 786). In Hagen's case, there is no dispute the tortious act occurred within work-related limits of time and place. The question is whether the act was related to his duties as an employee.

■ In *Fahrendorff v. North Homes, Inc.,* we considered whether a program counselor's illegal sexual advances toward a group-home resident occurred within the scope of employment. 597 N.W.2d at 910–11. Because the counselor's acts clearly occurred within the work-related limits of time and place, the real question before us was whether his acts were related to the duties of employment. *Id.* at 910. In considering that part of the test, we noted that "it is a question of fact whether the employee's acts were foreseeable, related to, and connected with acts otherwise within the scope of his employment." *Id.* Putting aside questions about whether Hagen's act was related to or connected with his employment, recent case law indicates that an important consideration in determining whether an act is related to the duties of employment is whether the act was foreseeable. *Id.* at 911; *P.L. v. Aubert,* 545 N.W.2d 666, 668 (Minn.1996); *Marston v. Minneapolis Clinic of Psychiatry and Neurology,* 329 N.W.2d 306, 311 (Minn.1983).

When reviewing whether an act is foreseeable in the context of respondeat superior, we do not require that the employer actually foresee the particular tortious act involved. *Fahrendorff*, 597 N.W.2d at 912. Rather, we require only a measure of foreseeability such that " 'an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' " *Id.* (citation omitted). Whether an employee's acts were foreseeable within the context of respondeat superior is a question of fact. *Id.* at 910. This standard of foreseeability is commonly proven, or a question of fact is raised, when a party establishes that the type of tortious conduct involved is a well-known industry hazard. *Id.* at 911.

In this case, the trial court found that American did not know or have reason to know that Hagen did not make appropriate arrangements with Burmeister before he sent out the letters—the action that led up to his UTSA violation. Thus, Burmeister was required to introduce at trial some evidence tending to show that Hagen's tortious act was foreseeable as that term is used in vicarious liability law: for example, evidence showing that the risk of employees misappropriating trade secrets is a well-known hazard in the insurance industry. *Fahrendorff*, 597 N.W.2d at 910–12. As the district court noted in its order granting summary judgment for American, however, Burmeister introduced no such evidence at trial. We will not assume, absent introduction of some evidence, that UTSA violations are a common hazard in the insurance industry. *See P.L.*, 545 N.W.2d at 668. Burmeister's failure to introduce any evidence establishing that it is foreseeable for insurance industry employees to misappropriate trade secrets,

and thus its failure to raise a fact question with respect to that issue, is fatal to its respondeat superior claim. *Id.* Accordingly, we conclude that American is not vicariously liable for Hagen's UTSA violation.

Reversed.