**INFINITY PRODUCTS, INC.,**
**Appellant–Plaintiff,**

v.

**Herbert QUANDT and Fabri–Tech,**
**Inc., Appellees–Defendants.**

No. 29A02–0105–CV–280.

Court of Appeals of Indiana.

Sept. 27, 2002.

Arend J. Abel, Ronald G. Sentman, Leagre Chandler & Millard, Indianapolis, IN, Attorneys for Appellant.

Karl L. Mulvaney, Nana Quay–Smith, Bingham McHale, Grover Davis, McClure McClure & Davis, Indianapolis, IN, William O. Harrington, Danville, IN, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

In October 1996, Infinity Products, Inc. ("Infinity") sued Herbert Quandt ("Quandt") and Fabri–Tech, Inc. ("Fabri–Tech"), alleging misappropriation of trade secrets and conversion. Quandt and Fabri–Tech filed counterclaims. Following a bench trial, the court entered judgment against Quandt in the amount of $1,017,937.04. The court later reduced the judgment to $763,253.24. The court did not find Fabri–Tech liable.

Infinity presents two issues for our review, which we consolidate and restate as:

1. Whether the trial court erred when it failed to hold Fabri–Tech vicariously or, in the alternative, primarily liable for misappropriation of trade secrets and conversion.

Fabri–Tech and Quandt cross appeal and present the following issues for our review:

2. Whether, assuming Fabri–Tech is liable for lost profits, it can also be held liable for punitive damages.

3. Whether the trial court's calculation of damages was erroneous.

We affirm in part, reverse in part, and remand for further proceedings.[1]

### FACTS AND PROCEDURAL HISTORY

Infinity and Fabri–Tech both manufacture webbing and strapping products in their Original Equipment Manufacturer ("OEM") divisions. These products include straps for high chairs, strollers, and toys. Infinity and Fabri–Tech are direct competitors. Linda Scott owns Infinity, and Infinity purchased the railroad and OEM divisions of T.E. Scott, Inc. ("T.E.Scott") in October of 1995.

Quandt began working for T.E. Scott between 1984 and 1985. In 1991, Quandt developed T.E. Scott's second OEM division and became T.E. Scott's primary contact for OEM customers. Quandt found customers by visiting K–Mart and Wal–Mart stores to discover which companies made products that required webbing or strapping components. He would then look up the telephone numbers of those companies in the Thomas Register or Dun & Bradstreet, call the numbers listed, and ask to speak with the companies' purchasing agents. Quandt would ask the purchasing agents to send him either a specification sheet or a sample product. T.E.

---

1. We heard oral argument on July 15, 2002.

Scott would then develop a cost summary to prepare a quote for the customer. Cost summaries include information about labor costs, material costs, and markup. According to Quandt and Linda Scott, it is important for companies to prepare cost summaries before quoting a price, so that they do not sell products at a loss or alienate customers by providing a quote that is too high.

T.E. Scott, Infinity, and Fabri–Tech all used similar procedures to prepare cost summaries. It usually took between three and four days to complete a cost summary, and a quote was rarely, if ever, issued without completing a cost summary. While Linda Scott was a controller at T.E. Scott, she never issued a quote without preparing a cost summary. T.E. Scott kept cost summaries, blueprints, requests for quotes, and quotes in customer files for between five and seven years. Quandt knew what prices T.E. Scott charged its customers for particular products, and he kept that information and customer contact information in three-ring binders, boxes, and file folders in his office.

T.E. Scott considered customer and pricing information confidential. A password was required to access computers that contained that information, the front door of T.E. Scott was locked, and a receptionist controlled access to the building. Quandt knew that customer and pricing information was considered confidential. All T.E. Scott employees, including Quandt, signed an employee handbook that included the following paragraph:

> Like physical assets, information is also a valuable Company resource. This includes information such as financial, operating, employee, customer, strategic, technological, or any other information produced or acquired through Company activities. *Any unauthorized use of Company information is strictly forbidden.* Those who, by the nature of their duties, possess or monitor confidential information hold a special position of trust. They have an important responsibility to maintain confidence. This means confidential information should not be discussed with family, friends, business or social acquaintances. Nor should it be discussed with other employees unless they have a clear right and need to know.

(Emphasis added). When Infinity purchased T.E. Scott's railroad and OEM divisions, it acquired T.E. Scott's customer and pricing information in the sale.

In June 1995, T.E. Scott circulated an internal memorandum to each of its employees regarding Infinity's purchase of the railroad and OEM divisions. Employees were informed that they could transfer to the T.E. Scott facility, which was being relocated to Rockville, or they could apply for employment with Infinity. Quandt did not apply for employment with Infinity and told Scott that she probably "could not afford" to hire him.

Before the sale, in August and September of 1995, some of Quandt's fellow employees noticed changes in his behavior. Quandt began carrying his briefcase in and out of the building during the day, despite the fact that he had previously carried his briefcase only when he arrived in the morning and left in the afternoon. Quandt also began making more frequent trips to the copy machine. Further, Quandt made trips from the building to his car while carrying a booster seat box. The booster seat remained in Quandt's office. Although Quandt told some of his co-workers that he planned to give the booster seat as a gift, the booster seat and box were still in Quandt's office after he left.

T.E. Scott terminated Quandt on October 5, 1995. After Quandt learned of his termination, he took several folders from his office and put them in his car. Linda

Scott was present when Quandt was fired, but she was not then employed at T.E. Scott. She asked Mike Bassett and Paul Pierson, T.E. Scott employees, to monitor Quandt while he removed items from his office. Bassett and Pierson monitored Quandt intermittently. Paul Seitzinger, another T.E. Scott employee, talked with Quandt in the parking lot after Quandt had been terminated. Quandt stated to him, "I built this company up. And as quickly as I built this company up, I can tear it down."

After Quandt left, Linda Scott observed several changes in his office. His desk drawers were empty; his Rolodex, which had been about three-quarters full, contained only a few cards; of his seven filing cabinet drawers which had been full, only three and one-half to four of them were still full; boxes that had been full were now empty; and his three-ring binders that had been full were now empty. Scott also found that many documents were missing from T.E. Scott's files, including requests for quotes, quotes, prints, samples, and cost summaries. In response to a document request in unrelated litigation, Quandt produced a list of T.E. Scott's top ten pet goods customers and top eight OEM customers, as well as a document listing names of T.E. Scott customers and individual data for their total sales, total amount of shipped orders, costs of goods, profit amount, product returns, and restocking charges.

Quandt called Don Menchhofer, president of Fabri–Tech, on October 6, 1995, to inquire about employment opportunities. Although the two men had not met or spoken to each other before that day, they met for lunch and then toured Fabri–Tech's factory. During their meeting Quandt and Menchhofer discussed, among other things, business with Little Tikes, one of T.E. Scott's biggest customers. Menchhofer asked Quandt whether he was restricted by a non-compete agreement,

and Quandt replied that he was not. At the conclusion of the meeting, Menchhofer agreed to hire Quandt.

Menchhofer hired Quandt to develop new customers for Fabri–Tech. Quandt was given no existing customers or sales leads. Quandt discussed with Menchhofer the possibility of sending a mailing to the customers he had developed while at T.E. Scott. Menchhofer did not permit Quandt to send a mailing, but he did give Quandt permission to telephone those customers.

On his first day at work, October 9, 1995, Quandt, using a direct dial number not available in either the Thomas Register or Dun & Bradstreet, telephoned the purchasing agent for Little Tikes. That same day, Quandt also contacted purchasing agents for Gleason, Old Dominion, Smart Products, and Tecla, all former T.E. Scott customers that had become Infinity customers.

All of the customers that Quandt contacted shifted some of their business from Infinity to Fabri–Tech. Quandt quoted prices to customers that were slightly lower than the prices quoted by Infinity. In some cases, the prices were lower by fractions of a cent. Fabri–Tech sometimes provided quotes without completing a cost summary. And of the cost summaries that were completed, some showed markups inconsistent with the prices Fabri–Tech actually quoted to Infinity's customers.

Menchhofer has been involved in preparing bids for Infinity's former customers. And as a general practice, either Menchhofer or his son sign off or in some way acknowledge a quote before it is sent to a customer for about ninety percent of all quotes. About ten percent of the time, their approval is unnecessary to provide a quote.

Infinity filed suit against Quandt and Fabri–Tech, alleging a violation of the

Indiana Uniform Trade Secrets Act ("IUTSA"), interference with prospective business advantage, and interference with contractual relations. Infinity also sought treble damages, attorney's fees, and costs of litigation under the Indiana Crime Victim's Relief Act, Indiana Code Section 34–24–3–1. Quandt and Fabri–Tech filed counterclaims and moved for summary judgment. The trial court granted the defendants' motion for summary judgment on the interference with prospective business advantage and interference with contractual relations claims, but denied the motion with respect to the remaining claims.

Infinity filed a motion for special findings. A bench trial was held from March 27–31, 2000. On April 5, 2001, the trial court entered its findings of fact, conclusions of law, and judgment. In particular, the trial court found that Infinity's costing and pricing information was a trade secret[2] and that Quandt had misappropriated Infinity's trade secrets and committed conversion. The court found that Infinity's actual losses due to Quandt's conversion totaled $300,061.39 and awarded Infinity treble damages and attorney's fees pursuant to Indiana Code Section 34–24–3–1. The court entered judgment in favor of Infinity Products and against Quandt in the amount of $1,017,937.04. The court did not find Fabri–Tech liable for Infinity's losses.

Quandt filed a motion to correct error on May 7, 2001, and the trial court modified its judgment, reducing the award to $763,253.24. Infinity appeals the trial court's finding that Fabri–Tech was not liable for either conversion or misappropriation of trade secrets. And Quandt appeals the damage award, arguing that it is excessive.

## DISCUSSION AND DECISION

### Standard of Review

■■■ Infinity appeals from a negative judgment. On appeal, we will not reverse a negative judgment unless it is contrary to law. *Stroud v. Lints,* 760 N.E.2d 1176, 1187 (Ind.Ct.App.2002) (citing *Comm'r, Dep't of Envtl. Mgmt. v. RLG, Inc.,* 755 N.E.2d 556, 559 (Ind.2001)). To determine whether the judgment is contrary to law, we consider the evidence in the light most favorable to the appellee together with all the reasonable inferences to be drawn therefrom. *Marquez v. Mayer,* 727 N.E.2d 768, 773–74 (Ind.Ct.App.2000), *trans. denied.* We will reverse the judgment only if the evidence leads to but one conclusion and the trial court reached the opposite conclusion. *Id.* at 774.

■■■ Because the trial court entered special findings, on appeal we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. *Carmichael v. Siegel,* 754 N.E.2d 619, 625 (Ind.Ct.App.2001). We will not set aside the findings or judgment of the trial court unless they are clearly erroneous. Ind. Trial Rule 52(A). Findings are clearly erroneous where a review of the record leaves us firmly convinced that a mistake has been made. *Carmichael,* 754 N.E.2d at 625. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* A judgment is clearly erroneous only if the findings of fact do not support its conclusions of law or its conclusions of law

---

**2.** On appeal, Fabri–Tech and Quandt do not challenge the trial court's finding that "Under Indiana law, Infinity's and its predecessor's substantial efforts to collect, compile, and use the pricing and costing information misappropriated by Quandt qualify that information as a protectable trade secret."

do not support its judgment. *Gibson County Farm Bureau Co-op. Ass'n v. Greer,* 643 N.E.2d 313, 315 (Ind.1994). Additionally, a judgment is clearly erroneous if it relies on an incorrect legal standard. *Carmichael,* 754 N.E.2d at 625. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions. *Id.*

### Issue One: Fabri–Tech's Liability

### A. Applicable Statutes and Trial Court's Conclusions of Law

The Indiana Uniform Trade Secrets Act defines "Misappropriation" as:

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) used improper means to acquire knowledge of the trade secret;

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(i) derived from or through a person who had utilized improper means to acquire it;

(ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) derived from or through a person who owed a duty to the person seeking relief to maintain secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ind.Code § 24-2-3-2. "Trade secret" is defined as information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.*

In its Conclusions of Law, the trial court stated:

15. The definition of the term "misappropriation" under the IUTSA includes, in addition to the improper "acquisition" of a trade secret, the subsequent disclosure of and use of an improperly acquired trade secret. The statute renders liable to any user who knew or had reason to know that the trade secret was improperly obtained. IC 24-2-3-2. *The Plaintiff presented circumstantial evidence to the Court that Fabri–Tech may have or should have known of the misappropriation and use of trade secrets. The Court finds, though, that there was insufficient evidence to find that Fabri–Tech, through its sales representative, misappropriated Infinity's trade secrets and improperly obtained Infinity's customers and sales, and Fabri–Tech costing personnel assisted in that effort.*

16. That further, *there was insufficient evidence presented to show that Fabri–Tech should be held liable under the doctrine of respondeat superior.*

(Emphases added).

Additionally, the Indiana Crime Victim Relief Act, Indiana Code Section 34-24-3-

1, allows a person who has suffered a pecuniary loss as a result of a violation of Indiana Code Section 35–43[3] to bring a civil action to recover the loss. A criminal conviction is not a prerequisite for bringing a civil action under Indiana Code Section 34–24–3–1. *Gilliana v. Paniaguas,* 708 N.E.2d 895, 899 (Ind.Ct.App.1999), *trans. denied.* And unlike a criminal trial, a claimant need only prove by a preponderance of the evidence that the criminal act was committed by the defendant. *Id.* A person commits criminal conversion where he "knowingly or intentionally exerts unauthorized control over property of another person." Ind.Code § 35–43–4–3. The words "exert control over property" are defined by statute to mean "to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property." Ind.Code § 35–43–4–1. Here, the trial court did not hold Fabri–Tech liable for criminal conversion. The court stated, "there was insufficient circumstantial evidence that Fabri–Tech aided and induced Quandt to 'exert unauthorized control' over Infinity's trade secrets, to make Fabri–Tech liable to Infinity."

### B. Fabri–Tech's Liability

■ Infinity contends that the trial court erred in not holding Fabri–Tech either vicariously or, in the alternative, primarily liable for misappropriation of trade secrets and conversion. Because we conclude that the evidence requires a finding of vicarious liability under respondeat superior, we need not address Infinity's arguments regarding primary liability.[4]

---

**3.** Article 43 of the Indiana Code deals with offenses against property, including criminal conversion.

**4.** Indiana law provides that where an employer is liable for the misconduct of an employee under the doctrine of respondeat superior,

■ Respondeat superior imposes liability, where none would otherwise exist, on an employer for its employees' wrongful acts that are committed within the scope of their employment. *Stropes v. Heritage House Childrens Ctr.,* 547 N.E.2d 244, 247 (Ind.1989). The doctrine is founded upon the principle that " 'he who expects to derive advantage from an act which is done by another for him must answer for any injury which a third person may sustain from it.' " *Stump v. Indiana Equip. Co., Inc.,* 601 N.E.2d 398, 403 (Ind.Ct.App. 1992) (quoting *Hall v. Smith* (1824), 2 Bing 156, 130 Eng. Reprint 265, 267 (1912)), *trans. denied.*

■ An employee's act is within the scope of his employment only if it is "in the service of the employer." *Shelby v. Truck & Bus Group Div. of GMC,* 533 N.E.2d 1296, 1298 (Ind.Ct.App.1989). An act is not within the scope of employment if the employee committed it with no intention to perform it as part of or incident to the service for which he is employed. *Gomez v. Adams,* 462 N.E.2d 212, 223 (Ind.Ct.App.1984). However, an employee's act may fall within the scope of his employment if his purpose, to an appreciable extent, was to further his employer's business, even if the employee was predominantly motivated by an intention to benefit himself. *Id.* Even criminal acts may fall within the scope of employment if "the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope." *Stropes,* 547 N.E.2d at 247.

both the employer and employee are jointly and severally liable. *United Farm Bureau Ins. Co. v. Blossom Chevrolet,* 668 N.E.2d 1289, 1291 (Ind.Ct.App.1996), *trans. denied; Gomez v. Adams,* 462 N.E.2d 212, 225 (Ind.Ct.App. 1984).

 An act may fall within the scope of employment if it is not authorized or even expressly forbidden by the employer. *Warner Trucking, Inc. v. Carolina Cas. Ins. Co.*, 686 N.E.2d 102, 105 (Ind.1997); *The Pittsburg, Cincinnati & St. Louis Ry. Co. v. Kirk*, 102 Ind. 399, 1 N.E. 849, 852 (1885). In *Kirk*, 1 N.E. at 850, our supreme court affirmed the liability of a railroad for the actions of its employee in transferring a hand car onto a neighboring line, where it subsequently struck the plaintiff. The employee had been returning the hand car, as directed by his employer, but the employer had not authorized the employee to transfer the car to another line. *Id.* Our supreme court stated:

> Where a servant is engaged in accomplishing an end which is within the scope of his employment, and while so engaged adopts means, reasonably intended and directed to the end, which result in injury to another, the master is answerable for the consequences, regardless of the motives which induced the adoption of the means. And this, too, even though the means employed were outside of his authority, and against the express orders of the master.

*Id.* at 852. Our supreme court recently reaffirmed the principles of respondeat superior liability expressed in *Kirk*:

> The critical inquiry is not whether an employee violates his employer's rules, but whether the employee is in the service of the employer. Even though an employee violates the employer's rules, orders, or instructions, or engages in expressly forbidden actions, an employer may be held accountable for the wrongful act if the employee was acting within the scope of employment.

*Warner Trucking, Inc.*, 686 N.E.2d at 105. Whether an employee's acts are within the scope of his employment is generally a question to be determined from the facts and circumstances of each case. *Gomez*, 462 N.E.2d at 223.

 In this case, the trial court stated in its conclusions of law that, "there was insufficient evidence presented to show that Fabri–Tech should be held liable under the doctrine of respondeat superior." Although we do not reweigh the evidence on appeal, we are compelled to reverse the trial court's judgment because all the evidence in the record supports the opposite conclusion, namely, that Fabri–Tech is liable under the doctrine of respondeat superior. *See Marquez*, 727 N.E.2d at 774.

The trial court found that Quandt took Infinity's costing and pricing information and used it to prepare quotes while at Fabri–Tech. Quandt used the information to secure customers for Fabri–Tech, the very purpose for which he was hired. Thus, Quandt's unauthorized use of Infinity's trade secrets originated in activities directly related to his employment at Fabri–Tech. *See Stropes*, 547 N.E.2d at 247. Whatever his motive, Quandt acted to further Fabri–Tech's business. Indeed, Quandt's use of Infinity's trade secrets occurred not only within the scope of his employment, but entirely for the benefit of Fabri–Tech. And although Fabri–Tech did not authorize Quandt to use Infinity's trade secrets, this lack of authorization does not remove Quandt's actions from the scope of his employment, because Quandt was still pursuing an objective that was within the scope of his employment. *See Kirk*, 1 N.E. at 852; *Warner*, 686 N.E.2d at 105.

Fabri–Tech urges, however, that Quandt's conversion and misappropriation of trade secrets could not fall within the scope of his employment because Quandt took Infinity's costing and pricing information *before* he was hired by Fabri–Tech, and even before he had any discussions with Fabri–Tech. Fabri–Tech points out

that in *Gomez*, 462 N.E.2d at 223, the security officer confiscated the plaintiff's personal papers while on duty. Fabri–Tech argues that the present case is distinguishable from *Gomez* because Quandt was not employed by Fabri–Tech when he took Infinity's trade secrets. That distinction does not preclude Fabri–Tech's liability, however, because the acts of conversion and misappropriation of trade secrets are not confined to the moment at which property is taken but continue for as long as a person exerts unauthorized control over the property, Indiana Code Section 35–43–4–1, or uses the property, Indiana Code Section 24–2–3–2. Quandt committed conversion and misappropriation of trade secrets not only when he physically removed Infinity's documents from its building, but also when he used the information in those documents to secure customers for Fabri–Tech.

Fabri–Tech also asserts that a party cannot be liable under either the IUTSA or the conversion statute unless it had knowledge of the violation. Fabri–Tech argues that the knowledge requirement of these statutes forecloses respondeat superior liability. Again, we must disagree.

As we have stated, the doctrine of respondeat superior imposes liability where it would not otherwise exist. *Stropes*, 547 N.E.2d at 247. With regard to the criminal conversion statute, we have already determined that an employer can be liable under respondeat superior for criminal conversion committed by an employee, provided that the employee acted within the scope of his employment. *See Gomez*, 462 N.E.2d at 223 (holding that an employer can be vicariously liable for the conversion committed by its employee). Thus, Fabri–Tech's argument as to criminal conversion lacks merit.

But neither this court nor our supreme court has had occasion to determine whether respondeat superior liability is available under the IUTSA. Other courts have addressed the same argument Fabri–Tech raises and have determined that respondeat superior applies under nearly identical trade secret statutes. *See Newport News Indus. v. Dynamic Testing, Inc.*, 130 F.Supp.2d 745 (E.D.Va.2001) (holding that an employer can be vicariously liable for its employee's misappropriation of trade secrets); *Hagen v. Burmeister & Assoc., Inc.*, 633 N.W.2d 497, 504 (Minn.2001) (assuming without deciding that employer can be vicariously liable for an employee's trade secrets violation where appellate court, in unpublished decision, affirmatively determined as much and parties did not challenge determination on appeal).[5] We agree with the reasoning of those courts. The misappropriation of trade secrets is an intentional tort. *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir.1998). And it is well established under Indiana law that respondeat superior applies when a third party seeks to hold an employer liable for the tortious acts of its employee. *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142, 148 (Ind.1999).

Therefore, we reject Fabri–Tech's assertion that it cannot, as a matter of law, be liable for misappropriation of trade secrets under a theory of respondeat superior, and we conclude that the evidence unmistakably demonstrates that, as a matter of law, Fabri–Tech is vicariously liable both for misappropriation of trade secrets and conversion.

### Issue Two: Punitive Damages

Fabri–Tech cross-appeals and asserts that a corporation's vicarious liability for

---

**5.** The relevant provisions of the IUTSA are nearly identical to the corresponding provisions of Virginia's and Minnesota's version of the Uniform Act. *See* Va.Code § 59.1–336; Minn Stat. §§ 325C.01–.07.

punitive damages is limited to common law torts. However, relying in part on our decision in *Gomez*, 462 N.E.2d at 223, the Seventh Circuit Court of Appeals has held that a corporation can be held vicariously liable for punitive damages assessed against its employee for violation of the conversion statute. *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 637–38 (7th Cir.1987). Judge Posner stated, "The majority rule at common law is that respondeat superior makes the employer or principal liable for the punitive as well as compensatory damages of the employee's or agent's torts." *Id.* at 638. That rule prevails in Indiana. *Stroud*, 760 N.E.2d at 1185 (citing *Stevenson v. Hamilton Mut. Ins. Co.*, 672 N.E.2d 467, 474–75 (Ind.Ct.App.1996), *trans. denied*). Fabri–Tech can, therefore, be held liable for punitive damages.

 Although punitive damages may be assessed against Fabri–Tech, the trial court has discretion whether to award punitive damages and what amount to award. Under Indiana Code Section 24–2–3–4(c), "If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a)." Indiana Code Section 34–24–3–1 provides that a person may sue a person who committed conversion against him for "[a]n amount not to exceed three (3) times the actual damages of the person suffering the loss." The statutes do not require an award of punitive damages, and, as Fabri–Tech notes correctly, there is no right to punitive damages under Indiana law. *Indiana & Mich. Elec. Co. v. Terre Haute Indus., Inc.*, 507 N.E.2d 588, 611 (Ind.Ct. App.1987), *trans. denied*. Thus, while the trial court may award punitive damages for either misappropriation or conversion,

the court may choose not to award punitive damages or to award less than the maximum amount of punitive damages authorized. *Citizens Nat'l Bank of Evansville v. Johnson*, 637 N.E.2d 191, 195 (Ind.Ct. App.1994).[6]

On remand, the trial court may consider that Menchhofer, Fabri–Tech's president, asked Quandt whether he was bound by a covenant not to compete. Although Menchhofer's inquiry does not excuse misappropriation of trade secrets or conversion, it may suggest that Fabri–Tech did not act willfully or maliciously, even if Quandt did. We remand for the trial court to determine whether Fabri–Tech should be liable for punitive damages.

**Issue Three: Calculation of Damages**

 Fabri–Tech and Quandt present several arguments that the trial court's damages award was erroneous. At trial, the plaintiff bears the burden of proof with respect to damages. *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1140 (Ind.Ct. App.2002). On review, however, we will sustain the trial court's award of damages if it is supported by any evidence in the record. *Ballard v. Harman*, 737 N.E.2d 411, 417 (Ind.Ct.App.2000). No degree of mathematical certainty is required in awarding damages. *Id.* Further, any doubts and uncertainties as to proof of the exact measure of damages must be resolved against the defendant. *Weston v. Buckley*, 677 N.E.2d 1089, 1093 (Ind.Ct. App.1997), *trans. denied*. "Public policy and justice require that the risk of uncertainty in the computation of damages be borne by the wrongdoer." *Id.* (citation omitted).

 Fabri–Tech and Quandt first assert that the trial court erred because it

---

**6.** The trial court's award of attorney's fees pursuant to Indiana Code Section 34–24–3–1 is mandatory. *Browning v. Walters*, 616 N.E.2d 1040, 1045 (Ind.Ct.App.1993), *modified on reh'g on other grounds*, 620 N.E.2d 28 (Ind.Ct.App.1993).

based its damage award on gross profits instead of net profits. It is well settled that a proper award of lost profits must be confined to lost net profits. *Ashland Pipeline Co. v. Indiana Bell Tel. Co., Inc.*, 505 N.E.2d 483, 490 (Ind.Ct.App.1987), *trans. denied.* As we explained in *Jerry Alderman Ford Sales, Inc. v. Bailey*, 154 Ind. App. 632, 291 N.E.2d 92, 105 n. 6 (1972), *modified on reh'g on other grounds*, 154 Ind.App. 632, 294 N.E.2d 617 (1973), the rationale for this rule is that a plaintiff "should not receive a windfall in the form of that portion of lost gross income representing *expenses of operation saved by defendant's breach.*" (Emphasis added).

The parties do not dispute that the correct measure of damages is net profits.[7] Rather, the dispute concerns whether some operating expenses should have been deducted from gross profits to calculate net profits. We note that at trial, Fabri–Tech and Quandt objected to Infinity's damage calculations as speculative. But in their post-trial briefs, they argued that Infinity's proposed calculations represent gross profits, not net profits. Infinity responded that it did not realize any savings in operating expenses because of Quandt's misconduct and, thus, under *Jerry Alderman*, its lost profits should be calculated by subtracting only the cost of labor and materials from the sales price. On appeal, Fabri–Tech again asserts that Infinity's calculations, which deduct only the cost of labor and materials, amount to gross profits instead of net profits.

▮ At trial, neither party introduced evidence of whether and, if so, what portion of operating expenses Infinity saved because of Quandt's misconduct. But there is evidence in the record of Infinity's general operating expenses. Specifically, tax records show total overhead, and OEM Cost Sheets show overhead attributed to a particular product. Still, these records do not demonstrate how much, if any, overhead Infinity saved after it lost customers to Fabri–Tech. Some operating expenses, rent, for example, may be "fixed" expenses unaffected by production, and there may be no direct correlation between a particular account and operating expenses. Moreover, there are factors other than the loss of business to Fabri–Tech that could have affected Infinity's overhead expenses during the relevant period.

As we have stated, no degree of mathematical certainty is required in awarding damages. *Ballard*, 737 N.E.2d at 417. While the trial court might have allocated a percentage of operating expenses to the disputed accounts and deducted that amount from gross profits, any such allocation would have been arbitrary given the scant evidence on this issue. And the trial court may well have accepted Infinity's assertion that it had realized no savings in operating expenses attributable to Quandt's misconduct. Thus, on this record, we cannot say that the trial court erred when it calculated lost net profits without deducting some amount for operating expenses. The trial court's damages award is within the scope of the evidence and, thus, is not clearly erroneous.

Fabri–Tech and Quandt also argue that the trial court should have limited an award of lost profits to the first three months Quandt worked at Fabri–Tech. Linda Scott testified at trial that it is Infinity's practice to re-cost a product every three months so it can re-quote a price to its customers. However, Scott did not testify that Infinity followed this practice

---

7. Fabri–Tech incorrectly asserts in its Brief that Infinity "contends that it should recover lost **gross** profits." (Emphasis in original). To the contrary, Infinity has consistently asserted that it is entitled to net profits, but that certain operating expenses should not be deducted because those costs were not saved by Infinity because of Quandt's misconduct.

when Quandt began working for Fabri–Tech. Further, some customers placed orders for periods longer than three months. Therefore, there was evidence presented to the trial court that Infinity was injured by Quandt's misconduct for longer than three months.

Next, Fabri–Tech and Quandt argue that some of Infinity's lost profits were incurred because it raised prices on some of its products and had no salesperson or only inexperienced salespeople for some of the time Infinity lost sales to Fabri–Tech. Although these factors may have contributed to Infinity's lost profits, Infinity presented evidence that it was Quandt's misappropriation of trade secrets and conversion that caused the lost profits. The trial court's inference that Quandt's conduct caused Infinity's lost profits was reasonable based on the evidence presented, and we will not overturn it on appeal.

Fabri–Tech and Quandt contend that the trial court should have calculated lost profits based on T.E. Scott's actual sales for the past two years instead of using T.E. Scott's sales for last year and multiplying it times two. They argue that this award is speculative because Infinity was a new company, and Fabri–Tech's sales of the disputed products were less than T.E. Scott's sales during its last year of OEM business. Although Infinity was a new company, it had an established customer base from T.E. Scott. Quandt testified that the customers at issue in this case had been with T.E. Scott for at least two years, and there were no indications that they planned to take their business elsewhere. And Fabri–Tech's actual sales are not a measure of a proper remedy for Infinity because Infinity is seeking damages, not restitution. *See Rollings v. Smith,* 716 N.E.2d 502, 507 (Ind.Ct.App.1999) (stating that damages remedy a plaintiff's loss while restitution remedies a defendant's

unjust enrichment). So there was credible evidence that but for Quandt's misconduct, Infinity would have continued selling the same quantity of OEM products that T.E. Scott had sold during its last year in the OEM business.

Finally, Fabri–Tech and Quandt assert that the trial court awarded damages for certain products even after Infinity had regained a customer it lost to Fabri–Tech. Specifically, Fabri–Tech and Quandt assert that the damages award for Smart Products Product # 7011 was erroneous, because Infinity regained Smart Products as a customer in the middle of 1997. However, neither Fabri–Tech nor Quandt presented evidence that Infinity had regained Smart Product's business *for this particular product* by 1997. Nor was there evidence presented on the amount of profits Infinity would have recovered after it regained Smart Product's business. Therefore, we conclude that evidence supports the trial court's award of damages.

## CONCLUSION

The trial court's findings, even when viewed in the light most favorable to the judgment, do not support its conclusion that Fabri–Tech was not vicariously liable for Quandt's misappropriation of trade secrets and conversion. At the time Quandt committed these acts, he was an employee engaged in Fabri–Tech's business. Thus, Fabri–Tech is vicariously liable for these acts under the doctrine of respondeat superior.

The trial court's damages award is consistent with the evidence. Although there is some conflicting evidence, we will sustain the trial court's damages award if it is supported by any evidence in the record. And despite Fabri–Tech's assertion to the contrary, a corporation can be held liable for punitive damages assessed against one of its employees. However, the punitive

damages statutes that apply here leave the decision whether and what amount of punitive damages to award, if any, to the trial court's discretion.

On remand, we direct the trial court to enter judgment against Fabri–Tech for Infinity's actual losses and attorney's fees and to determine whether punitive damages against Fabri–Tech are appropriate.

Affirmed in part, reversed in part, and remanded for further proceedings.

ROBB, J., concurs.

BAILEY, J., concurs with separate opinion.

BAILEY, J., concurring.

I concur in the result reached by the majority, but write separately to express my agreement with Fabri–Tech's characterization of the trial court's determination that the costing information constituted a trade secret as "questionable." As Fabri–Tech notes in a footnote in its Brief, Fabri–Tech argued below that the costing information was not a trade secret because it was readily available from other sources. The trial court, however, disagreed. While Fabri–Tech calls this ruling "questionable," Fabri–Tech, as our opinion correctly recognizes, does not challenge it upon appeal. Indeed, Fabri–Tech expressly states that "the evidence supports the finding that the only trade secret at issue here is the costing information...." (Fabri Tech's Brief at 30.) I believe the issue warranted further examination.

As our opinion notes, a trade secret is information that "derives economic value ... from not being generally known to, and not being readily ascertainable by proper means by, other persons...." IND. CODE § 24–2–3–2. As our supreme court recognized in *Amoco Production Co. v. Laird*, 622 N.E.2d 912, 915–916 (Ind.1993), the term "trade secret" is extraordinarily difficult to define, and the Indiana Uniform

Trade Secrets Act's phrase "not being readily ascertainable by proper means" is ambiguous. In *Amoco*, the court attempted to resolve some of this ambiguity by holding that "where the duplication or acquisition of alleged trade secret information requires a substantial investment of time, expense, or effort, such information may be found 'not being readily ascertainable' so as to qualify for protection under the Indiana Uniform Trade Secrets Act.'" *Id.* at 919. Moreover, because trade secrets may often be comprised of elements that by themselves may be in the public domain but which, in unique combination, afford competitive advantage, " 'the effort of compiling useful information is, of itself, entitled to protection even if the information is otherwise generally known.'" *Id.* at 920 (quoting *ISC Bunker Ramo Corp. v. Altech, Inc.*, 765 F.Supp. 1310, 1322 (N.D.Ill.1990)).

The facts of the *Amoco* case are instructive here. In that case, the Amoco Production Company ("Amoco") assembled a team of experts to determine the potential for oil exploration in parts of Indiana, Ohio and Michigan. The team reviewed both publicly available information from the United States Geologic Survey as well as confidential information. The team then conducted microwave radar testing with over flying aircraft to detect micro-emissions associated with concentrations of underground hydrocarbons at potential sites, at a cost of $150,000. The resulting data was used to create survey maps. Further evaluation and analysis indicated some of the targeted areas would not produce sufficient quantities of oil to warrant further exploration, so development of those sites was deferred. One of the team members was disappointed at the deferral, and turned over information regarding the location of the targeted areas to another person who proceeded to secure oil and gas exploration leases for the areas in

question. Amoco then overruled its previous deferral, and soon learned that its work product had been divulged. In the ensuing action, the team member argued that the information passed to the third party was not a trade secret because it could have been developed by means outside of Amoco's operations. The Indiana Supreme Court disagreed, noting that while each particular element of Amoco's work could have been duplicated by others with publicly available information and technology, Amoco had spent considerable time, effort and money combining those elements in a unique way to develop its oil field exploration information. 622 N.E.2d at 920.

The *Amoco* case clearly is at one end of the trade secret spectrum in terms of time, effort and expense, and I do not think that all trade secrets must be so difficult and expensive to obtain. The costing information involved in this case, however, appears to have been developed with such moderate levels of time, effort and expense that the characterization of the information as a trade secret must be regarded as questionable. To develop the costing information, Quandt simply visited stores to learn which companies produced items with webbing or strapping components, obtained samples or specifications sheets from those companies with a simple telephone call, and developed a cost summary (including information about labor costs, material costs and markup) to prepare price quotes for the companies. The rudimentary nature of this process probably explains the fact that Quandt was never asked to sign a non-compete agreement, the absence of which would have been known by Infinity through its pre-purchase due diligence. In any event, I do not believe that Quandt's use of a telephone and his performance of simple mathematics involved the kind of time, effort and expense required to deem the costing information, and the process by which it was obtained, "not … readily ascertainable by proper means…."

Unfortunately, we may not reach the question because no party raises it upon appeal, and we may not raise issues in a civil appeal sua sponte. *Daly v. Nau,* 167 Ind.App. 541, 339 N.E.2d 71, 77 (1975). Because no one has challenged the trial court's determination that the costing information constituted a trade secret, I must concur.