**INFINITY PRODUCTS, INC.,**
**Appellant (Plaintiff**
**below),**

**v.**

**Herbert QUANDT and Fabri–Tech, Inc.,**
**Appellees (Defendants below).**

No. 29S02–0305–CV–226.

Supreme Court of Indiana.

June 29, 2004.

Arend J. Abel, Ronald G. Sentman, Indianapolis, IN, Attorneys for Appellant.

Karl Mulvaney, Nana Quay–Smith, Indianapolis, IN, Attorneys for Appellee Herbert Quandt.

Grover Davis, Indianapolis, IN, William Harrington, Danville, IN, Attorneys for Appellee Fabri–Tech.

ON PETITION TO TRANSFER FROM THE INDIANA COURT OF APPEALS, NO. 29A02–0105–CV–280.

SHEPARD, Chief Justice.

Four days after T.E. Scott, Inc. fired Herbert Quandt, he began working for Fabri–Tech doing the same sort of work. Infinity Products, T.E. Scott's successor, eventually sued Quandt and Fabri–Tech alleging that Quandt used stolen trade secrets to lure Infinity customers to Fabri–Tech. The trial court held that Quandt was liable for misappropriating and converting Infinity's trade secrets and that Fabri–Tech was not.

We first address whether Fabri–Tech was directly liable under Indiana's Trade Secrets Act ("the Act"). Second, we examine whether Fabri–Tech can be vicariously liable under the Act through the doctrine of respondeat superior.

### Facts and Procedural History

In 1985, T.E. Scott, a manufacturer of webbing and strapping products, hired Quandt to develop its original equipment manufacturer ("OEM") division. The process of developing new products includes identifying finished consumer products like car seats or baby swings that incorporate webbing or straps. An OEM salesperson then contacts the consumer product manufacturer and negotiates a price quote for the webbing or strap. Pricing requires the OEM salesperson to determine the production cost of the webbing or strap through an internal quotation process, prepare a price summary, and then negotiate a final price with the consumer product manufacturer. All internal pricing and cost analysis documentation is confidential.

Quandt enjoyed ten successful years as an OEM salesperson for T.E. Scott. In 1995, T.E. Scott entered into negotiations to sell its OEM division. Linda Scott, the former controller for T.E. Scott, formed Infinity Products to purchase the OEM division. The sales agreement provided that Infinity would acquire all of T.E. Scott's trade secrets relating to the OEM division. Linda Scott required employees of T.E. Scott desiring to work for Infinity to complete an application process. Quandt refused to complete an application and indicated that Infinity would not be able to afford his services.

During negotiation of the sales agreement, fellow employees suspected Quandt of copying customer-specific documents and removing them from the office. The documents included contact information for T.E. Scott's customers, manufacturing

costs, and price summaries. Quandt kept all information relevant to pricing and costing in three-ring binders in his office. The information was confidential, and T.E. Scott used locked offices, locked file cabinets, and computer passwords to secure it. Quandt knew that all customer-specific information was confidential.

On October 5, 1995, four days before the sale was complete, T.E. Scott fired Quandt. Quandt packed up his office and took several boxes and file folders to his car before leaving. As he left, Quandt told T.E. Scott employee Paul Seitzinger, "I built this company up. And as quickly as I built this company up, I can tear it down." Tr. at 637. Linda Scott reported that customer-specific information was missing from several files after Quandt left.

The next day, Quandt contacted Don Menchhofer, the president and chief executive officer of Fabri–Tech Inc., to seek a sales position. Menchhofer had never met Quandt, but he immediately granted him an interview. The two did not discuss T.E. Scott's customers, but Quandt indicated that he had built a million dollar book of business for T.E. Scott. Quandt correctly indicated that he was not bound by any non-compete agreement with Infinity or T.E. Scott. Menchhofer hired Quandt that same day, paying a base salary of $40,000 per year, plus $1,000 for the first $100,000 in sales and four percent on all additional sales. Fabri–Tech did not provide Quandt with an existing customer list, so Quandt had to generate business from new customers.

On October 9, 1995, T.E. Scott effectuated the sale of the OEM division to Infinity. All of T.E. Scott's OEM customers thus became Infinity's customers.

On that same day, Quandt began working for Fabri–Tech. That morning, Quandt phoned five of Infinity's newly-acquired customers and informed them that he was with Fabri–Tech. During the following weeks, Quandt quoted prices of existing products now produced by Infinity and sold to these customers without the benefit of Fabri–Tech's internal cost analysis. See exhibits 14–21; Tr. at 312. Many of Quandt's quotes were mere pennies less than the price quoted by T.E. Scott for the identical product. See id. Subsequent to Quandt's telephone calls, five companies stopped ordering from Infinity and began ordering from Fabri–Tech. In total, Fabri–Tech received orders for seven products previously manufactured by Infinity.

In October 1996, Infinity sued Quandt and Fabri–Tech alleging misappropriation of trade secrets and conversion. Fabri–Tech answered and filed a counterclaim asserting that the misappropriated information did not constitute a trade secret and that it had no knowledge of the misappropriated information. In 1999, the trial court held that Infinity had a protectable interest in the trade secrets transferred to it from T.E. Scott. The parties tried the case to the bench in March 2000, and the court found in relevant part as follows:

> The Court also draws the reasonable, perhaps inescapable, inference from Quandt's behavior and the disappearance of documents from his office at the time of his departure, the absence, inconsistency and incompleteness of costing records of Fabri–Tech for the disputed items, and the fact that Fabri–Tech undercut Infinity's prices by just enough to secure sales of the disputed items, that Quandt took product pricing and costing information on his departure and that he used it to Infinity's detriment.

Appellant's App. at 35–36. The trial court also found that:

> The Plaintiff presented circumstantial evidence to the Court that Fabri–Tech may have or should have known of the misappropriation and use of trade se-

crets. The Court finds, though, that there was insufficient evidence to find that Fabri–Tech, through its sales representative, misappropriated Infinity's trade secrets and improperly obtained Infinity's customers and sales, and Fabri–Tech's costing personnel assisted in that effort.

That further, there was insufficient evidence presented to show that Fabri–Tech should be held liable under the doctrine of respondeat superior.

*Id.* at 40.

The trial court calculated Infinity's losses based on two years of projected profits for seven products as follows:

(1) Little Tikes Annie Swing Product: $84,894.60;

(2) Little Tikes Product No. 884637000: $12,455.50;

(3) Little Tikes Product No. 884309200: $19,943.48;

(4) Little Tikes Product No. 88434409200: $30,794.50;

(5) Gleason Product No. 860: $33,253.19;

(6) Old Dominion Product No.(s) 15200 & 15201: $10,529.40;

(7) Smart Products Product No. 7011: $23,296.12.

Compensatory damages totaled $215,166.79. The trial court also awarded Infinity exemplary damages of $430,333.58 and attorney fees of $117,752.87. As noted above, these damages were assessed against Quandt alone.

Quandt appealed the damages calculation, but the Court of Appeals affirmed. Infinity appealed the determination that Fabri–Tech had no liability. On this point

the Court of Appeals reversed, on the basis of respondeat superior, without addressing whether Fabri–Tech might have direct liability under the Act. *Infinity Products, Inc. v. Quandt,* 775 N.E.2d 1144 (Ind.Ct.App.2002). We granted transfer.

## I. Direct Liability

■■■ Infinity first contends that the trial court erred in finding that Fabri–Tech was not directly liable for misappropriation under Indiana's Trade Secrets Act.[1] At Infinity's request, the trial court entered special findings and conclusions pursuant to Trial Rule 52, so the standard of review is two-tiered:

> [W]e determine whether the evidence supports the trial court's findings, and we determine whether the findings support the judgment. We will not disturb the trial court's findings or judgment unless they are clearly erroneous. Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. In determining whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom.

*Bussing v. Ind. Dept. of Transportation,* 779 N.E.2d 98, 102 (Ind.Ct.App.2002) (citations omitted), *trans. denied.* Because Infinity appeals from a negative judgment, it must:

---

1. Infinity also contends that Fabri–Tech is directly liable for criminal conversion. *See* Ind.Code Ann. § 35–43–4–3 (West 1998). Infinity fails to make a cogent argument in support of this contention. We therefore do not address it. *See* Ind. Rules of App. Proc. 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22.")

demonstrate that the trial court's judgment is contrary to law. A judgment is contrary to law only if the evidence in the record, along with all reasonable inferences, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court. In conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences.

*DiMizio v. Romo,* 756 N.E.2d 1018, 1021 (Ind.Ct.App.2001) (citations omitted), *trans. denied.*

■ The analysis of Infinity's direct claim against Fabri–Tech begins with Indiana Code Section 24–2–3–2, which defines a "trade secret" as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The Act defines "misappropriation" in relevant part as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* Finally, improper means is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.*

In addition to injunctive relief, "a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." Ind.Code Ann. § 24–2–3–4(a) (West 1995). Additionally, for willful or malicious misappropriation, "the court may award exemplary damages in an amount not exceeding twice any award[.]" Ind.Code Ann. § 24–2–3–4(c).

The trial court found that Quandt misappropriated Infinity's trade secrets when he used Infinity's "customer lists, pricing, labor rates, overhead costs, suppliers, designs, blueprints, and specific needs of customers." Appellant's App. at 38–39; *see Amoco Prod. Co. v. Laird,* 622 N.E.2d 912 (Ind.1993) (for a discussion of trade secrets).

It found insufficient evidence to support Infinity's claim that Fabri–Tech was also liable under the Act because it knew or should have known of Quandt's misappropriation.

The record reveals that Quandt acquired all of the misappropriated information before seeking employment with Fabri–Tech. Before his dismissal from T.E. Scott, Quandt had never met Menchhofer. During Quandt's initial interview with Menchhofer, the two discussed Quandt's success as a salesperson, his experience in the OEM industry, and his connections with potential customers. Menchhofer asked Quandt if he was bound by a non-compete agreement to which Quandt responded in the negative. Fabri–Tech then hired Quandt for the purpose of soliciting new customers for its OEM division.

At trial, Menchhofer indicated that he was aware that Quandt contacted Infinity's customers. Indeed, during his first morning on the job, Quandt contacted several of Infinity's customers and informed them that he was now working for Fabri–Tech. Fabri–Tech's phone records indicate that Quandt used the buyer's direct numbers of Infinity's customers. In subsequent calls, Quandt quoted prices for existing products currently produced by Infinity to Infinity's

customers without completing Fabri–Tech's pricing procedure. Five of Infinity's customers placed orders with Fabri–Tech during the following months. Appellant's App. at 29–32.

While Quandt's disregard of Fabri–Tech's pricing procedure is suspicious, the state of the evidence was such that the trial court could respectably regard it as inadequate to demonstrate that Fabri–Tech knew or should have known of the misappropriation. As Quandt was not prevented from contacting Infinity's customers, Fabri–Tech was not prevented from authorizing him to do so. There is no evidence indicating that Fabri–Tech instructed Quandt to use trade secrets to lure Infinity customers away. Based on these facts, neither the trial court's findings nor judgment is erroneous. The court's judgment is not contrary to law, and we affirm the trial court on this issue.

## II. Vicarious Liability

■ The trial court held that Fabri–Tech was not liable for Quandt's acts under the doctrine of respondeat superior. Infinity contends this was error, as Quandt made use of Fabri–Tech's information while acting within the scope of his employment with Infinity, thus creating liability for his principal under the common law of torts. Fabri–Tech replied that respondeat superior is unavailable in an action covered by the Trade Secrets Act.

This debate turns in the first instance on the scope of the act as adopted by the General Assembly in 1982. The legislature has left us some direction on this point.

Indiana's statute is based on the Uniform Trade Secrets Act and we are one of some forty states that have adopted it. The legislature announced its purpose in adopting the uniform act and provided some guidance on its general construction: "This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject matter of this chapter among states enacting the provisions of this chapter." Ind.Code Ann. § 24–2–3–1(b) (West 1995). The General Assembly has also told us: "The chapter displaces all conflicting law of this state pertaining to the misappropriation of trade secrets, except contract and criminal law." Ind.Code Ann. § 24–2–3–1(c). Our legislature's statement about displacement of conflicting law is somewhat stronger than the one contained in the uniform act as it existed at the time the General Assembly acted.[2] And the commentary to the uniform act made plain then, as it does now, that the act was designed to cover "duties imposed by law," as opposed to duties that arise from agreements, for example.[3] Illinois courts, following similar provisions in that state's law, have held that common law remedies are supplanted by the act. *See, e.g., Pope v. Alberto–Culver Co.*, 296 Ill. App.3d 512, 230 Ill.Dec. 646, 694 N.E.2d 615 (1998); *AutoMed Technologies, Inc. v. Eller*, 160 F.Supp.2d. 915 (N.D.Ill.2001).[4]

2. The uniform act then provided that it "displaces conflicting tort, restitutionary, and other law of this State pertaining to civil liability for misappropriation of a trade secret." Unif. Trade Secrets Act § 7, 14 U.L.A. 463 (1990).

3. *Id.*

4. Infinity has also relied on the criminal conversion statute, Ind.Code Ann. § 35–43–4–3 (West 1988). While the uniform act declares that it does not displace criminal law, Ind.

Code § 24–2–3–1, we leave open the question whether civil provisions for treble damages based on certain criminal acts is covered by this declaration. It is unclear that the answer to the question would matter. To prove criminal conversion, one must establish a knowing or willing state of mind. The trade secrets act requires showing that the perpetrator "knows or has reason to know." Ind.Code § 24–2–3–2. It requires willful or malicious acts to support exemplary damages. Ind. Code § 24–2–3–4. As the trial court conclud-

As Infinity correctly points out, respondeat superior is a common law doctrine under which liability is imposed by law upon the master for acts done by the servant, regardless of the master's complicity in the acts. Indeed, it may impose liability even when the master directed the servant to the contrary. Appellant's Br. at 22.[5] Surely, this doctrine must be thought of as conflicting with the uniform act's requirements that a claimant demonstrate that the defendant "knows or has reason to know" that the trade secret at issue was acquired by improper means. Ind.Code Ann. § 24–2–3–2 (West 1988).[6] It is thus displaced by the provisions of the uniform act.

Of course, the uniform act affords fulsome avenues of relief for persons who believe that secrets belonging to them have wrongly been misappropriated. It supplies a remedy for money damages under a standard of proof that is, at first blush, less onerous that the common law usually requires. It also authorizes injunctive relief both to shut down actual misappropriation and to thwart threatened misappropriation. Ind.Code Ann. § 24–2–3–3. And it authorizes the award of attorney's fees upon conditions more liberal than most parts of our code. Ind.Code Ann. § 24–2–3–5.

We conclude that the trial court correctly held that Fabri–Tech could not be held liable absent the proof of scienter required by the uniform act.

### Conclusion

We affirm the trial court's judgment for Infinity against Quandt and its judgment for Fabri–Tech against Infinity.

SULLIVAN and BOEHM, JJ., concur.

DICKSON, J., dissents with separate opinion in which RUCKER, J., concurs.

DICKSON, Justice, dissenting.

The majority opinion acknowledges that the legislature's purpose in adopting the Uniform Trade Secrets Act (UTSA) was "to make uniform the law with respect to the subject matter of this chapter among states enacting the provisions of this chapter." Majority opinion at 1033, *quoting* Ind.Code § 24–2–3–1(b). By holding that the Uniform Act displaced the common law principle of respondeat superior liability, however, the majority creates a *lack* of uniformity. As noted by our Court of Appeals, two other jurisdictions, applying nearly identical trade secret statutes, have held that an employer may be vicariously liable for its employee's misappropriation of trade secrets. *Infinity Products, Inc. v. Quandt*, 775 N.E.2d 1144, 1153 (Ind.Ct.

---

ed on the principal claim, Fabri–Tech did not itself possess any of these levels of knowledge.

**5.** To be sure, corporations act through their officers and employees. Here, the finder of fact found inadequate scienter by the relevant corporate actors to warrant a judgment against the corporation.

**6.** In apparent contradiction is *Newport News Industrial v. Dynamic Testing*, 130 F.Supp.2d 745, 751 (E.D.Va.2001), in which a federal court opined that under Virginia law respondeat superior was available, saying:

Respondeat superior is not an independent conflicting tort, civil claim, or remedy.

Rather, it is a legal precept that presupposes the existence of an underlying claim and assesses liability not because of the act giving rise to the claim but because of a certain status. Thus, one cannot bring a claim of "respondeat superior," instead one simply relies on this theory as a vehicle for imposing on the principal liability for the underlying wrongful acts of the agent.

Virginia had adopted the uniform act's displacement provisions as written (conflicting tort, restitutionary and other law ... providing civil remedies for misappropriation of a trade secret). As we observed above, this language was rejected by our legislature in favor of a broader displacement.

App.2002), *citing Newport News Indus. v. Dynamic Testing, Inc.*, 130 F. Supp 2d 745, 751 (E.D.Va.2001) (permitting respondeat superior liability for violation of Virginia Uniform Trade Secrets Act); *Hagen v. Burmeister & Assoc., Inc.*, 633 N.W.2d 497, 504 (Minn.2001) (applying unpublished Minnesota Court of Appeals holding that employer can, as a matter of law, be vicariously liable for an employee's UTSA violation). *Cf. Sheltry v. Unum Life Ins. Co. of America*, 247 F. Supp 2d 169, 181 (D.Conn. 2003) (permitting vicarious liability claim against insurance company for broker's violation of Connecticut's Unfair Trade Practices Act); *Chanay v. Chittenden*, 115 Ariz. 32, 563 P.2d 287, 293–94 (1977) (permitting claim of vicarious liability of insurance company for unfair trade practices[1] of its general agent).

The time-honored common law principle of an employer's respondeat superior liability for the acts of an employee done in the scope of employment is not "conflicting law of this state pertaining to the misappropriation of trade secrets." Ind.Code § 24–2–3–1(c). The Uniform Act's requirement that a claimant demonstrate the wrongdoer's scienter does not "conflict" with the imposition of vicarious liability of the wrongdoer's employer. To the contrary, the risk of such liability serves as an incentive for employers to discourage their employees from using misappropriated trade secrets. The doctrine of respondeat superior thus does not conflict with, but rather fosters, the purposes of the act.

The majority avers that the Uniform Act "affords fulsome avenues of relief," but in reality, the relief is meager indeed when as here it is limited to the assets of the individual employee wrong-doer, and the employer who benefits from an employee's misappropriation is immunized from its

customary common law responsibility for the wrongful acts of its employees. *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142, 148 (Ind.1999).

I would reverse the trial court and find that Fabri–Tech can be held vicariously liable for Quandt's misappropriations done in the scope of employment.

RUCKER, J., concurs.

---

1. This claim, however, appears to have been a common law claim of unfair trade practice under the Restatement of Torts §§ 757, 759, rather than under the Uniform Trade Secrets Act.