Andrew D. PURCELL, Appellant–Defendant,

v.

SOUTHERN HILLS INVESTMENTS, LLC, Appellee–Plaintiff.

No. 49A05–0504–DV–191.

Court of Appeals of Indiana.

May 22, 2006.

Peter J. Rusthoven, Michael H. Gottschlich, Barnes & Thornburg, LLP, Edward F. Schrager, Steven M. Crell, Cohen Garelick & Glazier, Indianapolis, for Appellant.

Alan S. Brown, Julia Blackwell Gelinas, Lucy R. Dollens, Locke Reynolds, LLP, Indianapolis, for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Andrew D. Purcell (Purcell), appeals the trial court's Findings of Fact and Conclusions of Law in favor of Appellee–Plaintiff, Southern Hills Investments, LLC (Southern Hills), with regard to Southern Hills' Complaint against Purcell alleging a breach of fiduciary duty and self-dealing.

We affirm.

### ISSUES

Purcell raises three issues on appeal, which we restate as the following four issues:

(1) Whether the trial court erred by concluding that the manager of a limited liability company (LLC) breached his common law fiduciary duty to the LLC and the LLC's member;

(2) Whether the trial court erred by concluding that a manager's actions on behalf of an LLC constituted willful misconduct or recklessness pursuant to Ind.Code § 23–18–4–2;

(3) Whether the trial court erred by concluding that a member of an LLC can maintain a direct action, rather than a derivative action, against the LLC's manager; and

(4) Whether the trial court properly refused to offset the damages awarded to Southern Hills.

### FACTS AND PROCEDURAL HISTORY

Southern Hills is an Indiana limited liability company related to, and having certain owners in common with, Smithville Telephone Company, Inc. (Smithville). In furtherance of Smithville's telecommunications and data transmission needs, Southern Hills purchased fiber-optic cable from Metro Xmit, LLC (Metro), based in Indiana and owned by Purcell and his wife. After Metro constructed the fiber optic cable networks, it sold indefeasible rights (IRUs) granting purchasers usage rights to certain parts of the network over a long period of time, after which such rights revert to Metro.

On December 29, 1999, Southern Hills purchased from Metro an IRU to use the six strands of fiber optic cable in the Southern Loop for a total amount of $1.5 million. The Southern Loop was a circuit

of 216 fibers being constructed by Metro, forming a complete loop from Indianapolis to Bloomington to Columbus to Shelbyville to Indianapolis. Southern Hills' interest in completion of the Southern Loop caused it to loan money to Metro which, under Purcell's direction, was chronically short of cash. By March of 2000, Southern Hills had loaned approximately $3,500,000 to Metro.

In late 1999 and early 2000, Dwane Glancy (Glancy), Smithville's and Southern Hills' chief financial officer pursued discussions with Purcell to convert Metro's debt to an equity position held by Southern Hills in the Southern Loop project. In March of 2000, these discussions resulted in the formation of VillageNet Services, LLC (VillageNet), with Southern Hills and Metro as its sole members, each owning 50% of the newly created company. VillageNet's purpose was to market and sell fibers in the Southern Loop, providing its members with a return on their investments. In exchange for its 50% ownership interest in VillageNet, Southern Hills agreed to forgive Metro's indebtedness and provide additional operating capital to Metro which had an aggregate value to Metro of $5,000,000. Metro contributed an IRU for 188 of the 216 fibers in the Southern Loop. Metro and Southern Hills agreed that the IRU's value was $10,000,000, and thus, when offset against the $5,000,000 value of the forgiven indebtedness to Metro, both founding members were each deemed to have contributed $5,000,000 of value to VillageNet in ex-change for their equal ownership interests.

Pursuant to VillageNet's operating agreement, each of the members was to appoint its own representative as a VillageNet co-manager. In this regard, Metro appointed Purcell, while Southern Hills appointed Glancy. Furthermore, the operating agreement stipulated that Metro would be solely responsible for the construction of the Southern Loop, including the financing thereof. In addition, both co-managers agreed that Metro would perform VillageNet's administrative functions, including accounting. Accordingly, in April of 2000, Metro hired Toni Niemann (Niemann), a certified public accountant, who was also charged with VillageNet's accounting and who reported to Purcell.

At the time VillageNet was formed, Metro was negotiating with AEP Communications, Inc. (AEP) regarding the purchase of IRUs for fibers located both in- and outside the Southern Loop. However, because VillageNet now owned the IRU for the Southern Loop fiber, Metro was not in a position to sell the right in a single contract, as requested by AEP. In order to grant AEP's request, VillageNet re-assigned to Metro a portion of the Southern Loop IRU. However when drafting this assignment (Assignment Agreement), Glancy failed to include the Bloomington to Columbus portion of the Southern Loop. In exchange for the assignment, Metro agreed to forward to VillageNet AEP payments related to Southern Loop after Metro received them. Glancy estimated the total payment to be in the amount of $2,136,664. Thereafter, Metro and AEP executed a single IRU contract.

Niemann, as the controller for Metro and in charge of VillageNet's accounting, was responsible for allocating AEP's payments to Metro between those attributable to the Southern Loop project, which needed to be forwarded to VillageNet, and those attributable to fibers outside the Southern Loop, which were to be retained by Metro. As a result of Glancy's omission to include the Bloomington to Columbus portion in the assignment, Niemann failed to mark certain AEP payments as payable to VillageNet.

On or about October 31, 2000, Southern Hills received a payment of $945,473.82 from VillageNet. On December 29, 2000, Metro received a $200,717 payment from AEP for Southern Loop fiber. Metro did not forward any of this amount to VillageNet. Thereafter, on February 2, 2001, Metro received a payment of $473,870.15 from AEP, of which $301,075.50 was earmarked as Southern Loop fiber. Metro kept all of this money. In accordance with Glancy's Assignment Agreement, these payments should have been forwarded to VillageNet, minus a certain amount for administrative fees. A three percent commission would be paid by VillageNet to the member that had generated the sale, with the remainder of the sum distributed equally between both members.

On February 2, 2001, Purcell's wife wrote a personal check for $600,000 to Mastec North America (Mastec), one of Metro's contractors and creditors. Metro owed Mastec a substantial amount of money for the installation of fibers both in- and outside the Southern Loop project. The payment by Purcell's wife was treated as a loan to Metro. Eleven days later, on February 13, 2001, Purcell directed Metro to repay the loan, increased by twelve percent interest in the amount of $2,200, with funds received from AEP.

In March of 2001, Metro obtained refinancing under a Bridge Loan Agreement with GE Capital. Under the terms of the Bridge Loan, Metro was severely restricted in its ability to independently manage its cash resources. During May of 2001, Niemann discovered that the Bloomington to Columbus portion of the Southern Loop was mistakenly omitted from the Assignment Agreement. She calculated that in addition to a $160,249.80 payment received from AEP on February 9, 2001, Metro had received and kept all other AEP payments for the Southern Loop instead of forwarding them to VillageNet. She informed Purcell of this omission and resulting accounting errors and consequently advised Purcell to inform Glancy and forward VillageNet the money it was due.

Because of Glancy's omission in the Assignment Agreement, Metro had sold AEP an IRU for fibers it did not own. In June or July of 2001, Niemann and Pat Opelt, Metro's general manager, met with Glancy to revise the Assignment Agreement. Neither Niemann nor Opelt told Glancy about the AEP money for the Southern Loop that Metro had failed to forward to VillageNet. As a result of this meeting, Glancy prepared a corrected Assignment Agreement from VillageNet to Metro for the pertinent Southern Loop segment. This IRU assignment was backdated to be effective as of June 2000, and called for a total payment of $ 3,146,249 due one year after successful completion of the testing program.

In the late spring or summer of 2001, AEP decided to return eight fibers to Metro and, consequently, only paid for twenty-eight fibers. Upon the fibers' return, Metro offered to assign these eight fibers back to VillageNet. VillageNet refused this offer. Instead, VillageNet wanted Metro to sell the fibers and distribute the proceeds. On November 26, 2001, Metro filed for bankruptcy, with the eight returned strands held as assets. One year later, on November 19, 2002, Southern Hills and VillageNet entered into a settlement agreement with Indiana Fiber Works (IFW), successor in interest to Metro through purchase of Metro's assets in bankruptcy.

On August 29, 2002, Southern Hills filed a Complaint against Purcell, which it subsequently amended on November 21, 2003. This Amended Complaint alleges a breach of fiduciary duty and acts of self-dealing. On December 6 through December 7, 2004,

a bench trial was held. Thereafter, on February 14, 2005, the trial court issued its Findings of Fact and Conclusions of Law in favor of Southern Hills and awarded damages in the amount of $375,590.02, plus prejudgment interest in the sum of $120,518.18.

Purcell now appeals. Additional facts will be provided as necessary.

## DISCUSSION

### I. Standard of Review

In the instant case, the trial court entered special findings of fact and conclusions of law pursuant to Ind. Trial Rule 52(A). Therefore, our standard of review is two-tiered: we first determine whether the evidence supports the trial court's findings, and second, we determine whether the findings support the judgment. *Infinity Products, Inc. v. Quandt*, 810 N.E.2d 1028, 1031 (Ind.2004). Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. *Id.* In determining whether the findings or the judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id.*

In conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences. *Id.* However, while we defer substantially to findings of fact, we do not do so to conclusions of law. *Carmichael v. Siegel*, 754 N.E.2d 619, 625 (Ind.Ct.App.2001). We evaluate questions of law *de novo* and owe no deference to a trial court's determination of such questions. *Id.*

### II. Common Law Fiduciary Duty to Southern Hills as a Member of VillageNet

Initially, Purcell contends that the trial court erred by concluding that he breached his fiduciary duty owed to VillageNet and Southern Hills. Specifically, he asserts that none of his actions at issue can credibly be characterized as a violation of his fiduciary duty under common law principles.

Limited liability companies, such as VillageNet, were not available in Indiana until the enactment of Indiana's Business Flexibility Act in 1993. I.C. § 23–18–1–1 *et seq.* The recent popularity of LLCs has forced courts nationwide to address traditional business issues in terms of this new statutory creation. In Indiana, there is relatively little case law regarding LLCs and no case law concerning fiduciary duties in the LLC context. In this regard, parties present this court with an issue of first impression. However, we are not writing on a completely *tabula rasa:* the United States District Court for the Northern District of Indiana has provided us some guidance in *Credentials Plus, LLC v. Calderone*, 230 F.Supp.2d 890 (N.D.Ind.2002). Reviewing the issue of whether an LLC's member violated a common law fiduciary duty owed to other member, the district court in its analysis focused on the LLCs hybrid nature between a corporation and a partnership and found that Indiana LLCs impose a common law fiduciary duty on their officers and members in the absence of contrary provisions in the LLC operating agreements. *Id.* at 899.

In *Credentials Plus*, the LLC, besides advancing federal claims, sued Calderone, a former member and operating employee for breach of her fiduciary duties. *Id.* at 894. In its evaluation of fiduciary duties within the Indiana Uniform Partnership Act and closely-held corporations, the dis-

trict court concluded a detailed comparison to a shareholder's fiduciary duties in a closely held corporation to be appropriate. *Id.* at 900. The court based its conclusion on the resemblance of Credentials Plus to a closely-held corporation, *i.e.*, the LLC's membership consisted of three members and there was no evidence that the company's shares were publicly traded. *Id.* In light of this analysis, the district court continued,

> [s]hareholders may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to other shareholders and the corporation. A shareholder's fiduciary duty requires that he not appropriate to his own use a business opportunity that in equity and fairness belongs to the corporation. The standard imposed by a fiduciary duty is the same whether it arises from the capacity of a director, officer, or shareholder in a close corporation.

*Id.* (internal quotations omitted). Applying these principles to the case before it, the district court found Calderone to have violated her fiduciary duties to Credentials Plus resulting in self-dealing and a breach of her duty of loyalty under Indiana law. *Id.* at 900.

In line with the district court's opinion in *Credentials Plus,* we now hold that common law fiduciary duties, similar to the ones imposed on partnerships and closely-held corporations, are applicable to Indiana LLCs.

Here, in support of their respective arguments, both parties direct us to the same case in an attempt to clarify the extent of common law fiduciary duties of an LLC's manager or member. In *G & N Aircraft, Inc. v. Boehm,* 743 N.E.2d 227, 227 (Ind.2001), Boehm, the minority shareholder of the closely-held corporation, G & N Aircraft, brought an action against the majority shareholder, Goldsmith, and the corporation, alleging breach of fiduciary

duty. Imposing a fiduciary duty standard arising from the capacity of shareholder in a closely-held corporation, our supreme court stated that "[t]he fiduciary must deal fairly, honestly, and openly with his corporation and fellow stockholders. He must not be distracted from the performance of his official duties by personal interests." *Id.* at 240 (citing *Hartung v. Architects Hartung/Odle/Burke, Inc.,* 157 Ind.App. 546, 301 N.E.2d 240, 243 (1973)).

Concluding that Purcell had violated his fiduciary duties, the trial court found:

29. Purcell breached his fiduciary duty to VillageNet and Southern Hills in the following respects:

- He failed to advise Glancy or anyone associated with Southern Hills that payments had been received by Metro from AEP for Southern Loop fibers.

- He used payments received by Metro from AEP for Southern Loop fibers to repay a personal loan.

- He failed to advise Glancy or anyone associated with Southern Hills that payments received by Metro from AEP for Southern Loop fibers were used to repay a personal loan.

- He directed Metro to keep and spend money that belonged to VillageNet and Southern Hills.

- He directed payments of substantial sums of money to creditors of Metro instead of to VillageNet and Southern Hills.

. . .

32. Purcell engaged in acts of self-dealing to the detriment of VillageNet and its member, Southern Hills, in the following respects:

- He used payments received by Metro from AEP for Southern Loop

fibers to repay personal loans made by Purcell and his wife.

- He directed payments of substantial sums of money to creditors of Metro instead of to VillageNet and Southern Hills.
- He failed to advise Glancy or anyone associated with Southern Hills of these activities, preventing Southern Hills from taking any steps to recover its losses before Metro filed for bankruptcy.

(Appellant's App. pp. 23, 24).

Our review of the record discloses that pursuant to VillageNet's operating agreement, Purcell, as the co-manager, was responsible for the daily operation of the LLC. However, the operating agreement clearly stipulates that "the [m]anagers may have other business interests and shall devote only so much attention, skill and energies to the business and operations of [VillageNet] as they deem reasonable to promote the interests of [VillageNet] and the [m]embers." (Appellant's App. p. 58). In furtherance of VillageNet's business of making the Southern Loop's IRU profitable, both managers, in name of their respective member, agreed to reassign a portion of the 216 fibers representing the Southern Loop's IRU back to Metro for the sole purpose of its sale to AEP in a single contract. At the same time, the Assignment Agreement specified that Metro would forward to VillageNet all AEP payments related to the Southern Loop project after Metro received them. Upon receipt by VillageNet, the payment, minus commission and administrative costs, would be equally distributed between the members.

Our review of AEP's payment history reflects that although several payments were made to Metro, they were never forwarded to VillageNet. Specifically, on December 29, 2000, Metro received a $200,717 payment for Southern Loop fiber, which was not forwarded. On February 2, 2001, the amount of $301,075.50 was received, but not transferred to VillageNet. Likewise, a February 9, 2001 payment in the amount of $160,249.80 was never forwarded to VillageNet. Further, around the time of the February AEP payments, Metro became financially unstable with a contractor threatening to stop work if he did not receive payment for work performed to fibers in-and outside the Southern Loop. Accordingly, the record shows that on February 2, 2001, Purcell's wife wrote a personal check to the contractor for $600,000. Thereafter, on February 13, 2001, this loan was repaid with funds received from AEP.

Instead of addressing the trial court's concerns as enumerated in its two findings, Purcell, in his brief, focuses solely on the repayment of his personal loan and plainly makes the all-encompassing argument that he did not breach his fiduciary duty because he did not know at the time that the AEP payments to Metro which were used to repay his loan included amounts earmarked as Southern Loop payments. In reply, Southern Hills asserts that Purcell "admitted" he knew that the amount of $160,249.80 was a Southern Loop payment that belonged to VillageNet. (Appellee's Br. p. 14). We disagree with Southern Hill's characterization of Purcell's testimony. Our review of the transcript reveals that, in reply to the question "[a]nd that money belonged to VillageNet, not to Metro. Isn't that true." Purcell stated: "That's my understanding, yes, from this document." (Transcript p. 153). Although being a far cry from an admission, like the trial court, we are equally unpersuaded by Purcell's answer.

Accordingly, especially in light of AEP's payment history, we conclude that the trial court could reasonably infer that Purcell knew about AEP's payment for Southern

Loop's fibers, but instead of forwarding the amount to VillageNet, as obliged under the Assignment Agreement, Purcell kept the money at Metro. *See Infinity Products, Inc.,* 810 N.E.2d at 1031.

Nevertheless, even disregarding the question of Purcell's knowledge, we conclude that Purcell still breached his fiduciary duty to VillageNet. Evidence introduced at trial establishes that during a meeting with Purcell in May of 2001, Niemann not only informed him of Glancy's mistake in the Assignment Agreement, but also advised him to forward VillageNet the amount it was due. The record is clear that Purcell did not advise Glancy until June or July of 2001, and even then, Purcell only admitted that Metro had failed to forward the last AEP payment in the amount of $160,249.80. Accordingly, we fail to find that Purcell acted fairly, honestly, and openly with VillageNet and Southern Hills. *See G & N Aircraft, Inc.,* 743 N.E.2d at 240.

The record further discloses that Purcell not only kept AEP money that should have been forwarded to VillageNet and instead chose to repay a personal loan, but he also failed to inform VillageNet and its member of the money that was owed to them. Consequently, we conclude that Purcell was clearly distracted from the performance of his official duties by personal interests. *See id.* at 240. Thus, we find that the evidence along with all reasonable inferences supports the trial court's findings and its conclusion that Purcell breached his fiduciary duty to VillageNet and Southern Hills.

### III. *Willful Misconduct & Recklessness*

■ Next, Purcell contends the trial court's conclusion that he acted willfully and recklessly in accordance with I.C. § 28–14–4–2. Specifically, Purcell claims that there is no evidence of any wrongdoing on his part.

■ Indiana Code Section § 23–18–4–2(a) (emphasis added) provides that:

Unless otherwise provided in a written operating agreement, a member or manager is not liable for damages to the limited liability company or to the members of the limited liability company *for any action taken or failure to act on behalf of the limited liability company,* unless the act or omission constitutes willful misconduct or recklessness.

We clarified the concept of willful misconduct or recklessness in *Miner v. Southwest School Corp.,* 755 N.E.2d 1110 (Ind.Ct. App.2001), where we stated that "a willful and wanton act of commission is: an intentional act done with the reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the other actor at the time." *Id.* at 1113 (citing *Witham v. Norfolk & W. Ry. Co.,* 561 N.E.2d 484, 486 (Ind.1990)). We further characterized a willful and wanton omission as a failure to act when the actor has actual knowledge of the natural and probable consequence of injury and his opportunity to avoid the risk. *Id.* "Whether the party has acted or failed to act, willful and wanton misconduct has two elements: 1) the defendant must have knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury; and 2) the actor's conduct must have exhibited an indifference to the consequences of his own conduct." *Id.*

In his brief, Purcell first advances the argument that he did not engage in any improper self-dealing by making a personal loan to Metro and by subsequently repaying it. Purcell maintains that the loan was to VillageNet's benefit because it avoided an immediate threat to the Southern Loop project. Purcell explains that by paying Metro's contractor's debt Purcell ensured Mastec's continued work on the

project. Purcell relies on Indiana and out-of-state case law supporting the premise that a corporation may borrow money from its officers and any repayment of this loan should be carefully scrutinized to prevent the officer's abuse of his position to obtain an unfair advantage over other creditors. *See Bossert v. Geis,* 57 Ind.App. 384, 107 N.E. 95, 98 (1914); *In re Mader's Store for Men, Inc.* 77 Wis.2d 578, 254 N.W.2d 171, 185 (1977).

Although Purcell cites a lengthy passage from *Mader's* in his brief, we find the following language to be more illustrative for the case at bar:

> [H]owever, the possibilities for abuse are manifold, and where the rights of third parties are implicated, the law approaches transactions between a corporation and those in a position to control its acts with "a large measure of watchful eye." ... [I]f it appears that honoring the claim will work an injustice, subordination or disallowance of the claim may be required.

*Mader's,* 254 N.W.2d at 185. Here, we are not persuaded that the repayment of Purcell's loan was in furtherance of VillageNet's interest. The record clearly establishes that Purcell, as Metro's CEO, made a personal loan to Metro to satisfy his company's debt to one of its creditors. At the time of repayment, Purcell allocated AEP Southern Loop money that belonged to a third party, VillageNet, to honor the personal loan. Purcell now relies on Mastec's threat to stop work on the Southern Loop project to support his allegation that repayment of his personal loan with AEP Southern Loop money somehow was in VillageNet's interest as the Southern Loop project was the very purpose of the VillageNet venture. However, at trial Purcell admitted that pursuant to VillageNet's operating agreement Metro was solely responsible for financing and constructing the Southern Loop. Accordingly, by loan-ing money in order to pay Metro's debt to Mastec, Purcell satisfied a debt of Metro and not of VillageNet. Therefore, using AEP Southern Loop money, which was to be forwarded to VillageNet, to repay his loan Purcell acted solely in Metro's interest and to the detriment of the third party, VillageNet.

Next, Purcell attempts to establish the trial court's error in its conclusion that "Purcell's action in paying himself when he knew Metro had failed to turn over revenue to VillageNet and Southern Hills and failing to make disclosure of these facts constitute willfull and reckless conduct" by alleging that he was unaware that AEP payments were used to repay his voluntary loan. (Appellant's App. p. 27). However, as we stated above, in light of the evidence available and especially AEP's payment history we conclude that the trial court could reasonably infer that Purcell knew about AEP's payment for Southern Loop's fibers, but instead of forwarding the amount to VillageNet, as obliged under the Assignment Agreement, Purcell kept and spent the money. Accordingly, we find that by repaying his personal loan with funds rightfully belonging to VillageNet, Purcell's conduct exhibited an indifference to the consequences of his own conduct. *See Miner,* 755 N.E.2d at 1113. Therefore, we refuse to reverse the trial court's conclusion that Purcell's misconduct amounted to willfulness or recklessness. *See* I.C. § 23-18-4-2.

IV. *Direct versus Derivative Action*

Next, Purcell challenges the trial court's judgment by raising a standing issue. In particular, Purcell claims that Southern Hills has no direct claim against Purcell, and that any right it possessed derived solely from its status as a member of VillageNet.

In *G & N Aircraft,* our supreme court clarified the difference between direct and derivative actions and generally defined a

direct action as "[a] lawsuit to enforce a shareholder's rights against a corporation. This action may be brought in the name of the shareholder to redress an injury sustained by, or enforce a duty to, the holder." *G & N Aircraft*, 743 N.E.2d at 234 (internal quotations omitted). A derivative action, on the other hand, is a suit "asserted by a shareholder on the corporation's behalf against a third party ... because of the corporation's failure to take some action against the third party. They are brought to redress an injury sustained by, or enforce a duty owed to, the corporation." *Id.* (internal quotations omitted).

However, our supreme court acknowledged that the distinction between direct and derivative claims has been complicated in recent years by recognition in many jurisdictions, including Indiana, of direct actions by shareholders in closely-held corporations [1] for derivative claims. In *Barth v. Barth*, 659 N.E.2d 559, 561 n. 6 (Ind.1995), the court held that a shareholder in a closely-held corporation need not always bring a claim of corporate harm as a derivate action. Rather, in such an arrangement, the shareholders are more realistically viewed as partners, and the formalities of corporate litigation may be bypassed. The *Barth* court, following the American Law Institute's Principles of Corporate Governance Section 7.01(d), held that a shareholder of a closely-held corporation may proceed against a fellow shareholder in a direct action if that form of action would not: (1) unfairly expose the corporation or the defendants to a multiplicity of actions, (2) materially prejudice the interests of creditors of the

corporation; or (3) interfere with a fair distribution of the recovery among all interested persons. *Id.* at 562. Clarifying its reasoning, the supreme court stated that requiring a demand on the board and awaiting the recovery to the corporation may not be appropriate in a closely-held corporation where there are only two shareholders, and one owns a majority of the stock and controls the board. *Id.* Nevertheless, we are cautioned that the exception did not abrogate the rule: "it is important to keep in mind that the principles which gave rise to the rule requiring derivative actions will sometimes be present even in litigation involving closely-held corporations." *Id.* at 562.

In the instant case, Southern Hills pursued two claims against Purcell for clarity's sake, we will discuss each action in turn.[2]

### A. With respect to Southern Hills' Common Law Fiduciary Claim

■ Based on the facts before us, insofar as Southern Hills relies on the claim that Purcell violated his fiduciary duties to Southern Hills as a Member of VillageNet, this is properly asserted in a direct action because it is based upon rights and duties owed to Southern Hills, not VillageNet. *See Barth*, 659 N.E.2d at 560–61 & n. 4. Because Southern Hills is asserting a direct claim addressing a harm in its own name and not a derivative claim of corporate harm in the name of VillageNet under the guise of a direct claim, we do not need to investigate whether the *Barth* exception is applicable.

---

1. As we have declared closely-held corporations to be similar in character to LLCs, we will continue to apply the case law with respect to derivative and direct claims in a closely-held corporation to LLCs.

2. The trial court determined that Purcell breached his fiduciary duty to Southern Hills

and committed wrongful acts and omissions but did not differentiate the capacity in which Purcell acted or specify which duties to whom were breached. For the reasons explained below, we agree with the trial court's basic holding that the facts as found support a direct action by Southern Hills against Purcell.

## B. *With respect to Southern Hills' Statutory Claim*

■ In addition to bringing a direct claim based on a breach of common law fiduciary duties, we conclude that Southern Hills can bring a direct claim against Purcell pursuant to I.C. § 23–18–4–2. The plain language of the statute provides that "a member or manager is not liable for damages to the limited liability company or to the members of the limited liability company ... unless the act or omission constitutes willful misconduct or recklessness." Therefore, we find that the statute supports a direct action by Southern Hills against Purcell in his capacity as VillageNet's manager.

## V. *Trial Court's Refusal to Offset the Damages*

Lastly, Purcell asserts that the trial court erred in refusing to offset the damages it awarded to Southern Hills. Specifically, Purcell's allegation is two-fold: (1) the trial court improperly awarded Southern Hills double recovery of amounts it had already received on the same claim during its proceedings in bankruptcy against Metro and (2) the trial court improperly disregarded Purcell's request for a "true-up" in the price provision of an IRU agreement entered into between Southern Hills and Metro in accordance with the industry's practice.

■ We have previously held that a party may not recover twice for the same wrong. *INS Investigations Bureau, Inc. v. Lee,* 784 N.E.2d 566, 577 (Ind.Ct.App. 2003), *trans. denied.* Damages are awarded to compensate an injured party fairly and adequately for the loss sustained. *Id.* Because the law disfavors a windfall or a double recovery, "our supreme court has noted that double recovery constitutes fundamental error which cannot be waived." *Id.*

## A. *Proceedings in Bankruptcy*

■ First, Purcell asserts that the trial court improperly awarded Southern Hills double recovery of amounts it had already received on the same claim during its proceedings in bankruptcy against Metro. In support of his contention, Purcell focuses this court's attention on Southern Hills' claim asserted in the bankruptcy case filed November 26, 2001 which provides: "The claim arises out of Metro's wrongful withholding of amounts owed to VillageNet ... Metro collected amounts owed to VillageNet and did not turn over these monies to Southern Hills." (Appellant's App p. 218). The bankruptcy proceedings settled and under the bankruptcy settlement agreement, Southern Hills was ultimately awarded $288,000. Purcell now maintains that the trial court improperly concluded that the amount arising out of the bankruptcy settlement was not compensation for the same damages Southern Hills is claiming in the case before us. We disagree.

Whereas the language in the bankruptcy complaint clearly requests damages for Metro's wrongful withholding of amounts owed to VillageNet, the bankruptcy settlement entered into on November 19, 2002 by IFW, Metro's successor in bankruptcy, and Southern Hills nevertheless clearly stipulates that in exchange for a subordination of IFW's claims against Purcell, payment of $288,000, and future consideration, IFW received: (1) dismissal of Southern Hills' Adversary proceedings in the Metro bankruptcy; (2) release of all liens, claims, and encumbrances, including all UCC filings and utility mortgages Southern Hills had placed on Metro's assets; (3) consent to IFW's membership and full participation in VillageNet under the operating agreement; and (4) release of 12 fibers in the Southern Loop. The bankruptcy settlement is silent on Metro's

wrongful withholding of amounts owed to VillageNet.

Accordingly, there is no evidence supporting Purcell's contention that the damages ultimately covered in the bankruptcy settlement include damages for Metro's withholding of amounts owed to VillageNet. Therefore, we cannot but conclude that the trial court's finding that the payment under the settlement agreement is not for compensation of the damages Southern Hills seeks in its current claim is supported by the evidence and, in turn, its conclusion to refuse Purcell's setoff claim is supported by the finding. Consequently, we refuse to disturb the trial court's judgment.

## B. *True–Up*

 In a second argument in favor of set-off, Purcell contends that the trial court improperly denied a set-off stemming from amounts that Southern Hills failed to pay for an IRU entered into between Southern Hills and Metro on December 29, 1999 (Southern Hills IRU). Separate from the Southern Loop fibers owned by VillageNet, this IRU provided Southern Hills with six fibers in the Southern Loop project. Even though the Southern Hills IRU appears to have priced the fibers as a lot, Purcell now urges this court to consider the industry's practice of true-up in its interpretation of the contractual provisions. As the contracts in the fiber industry are typically written based on estimated miles of fibers to be installed, a true-up or price adjustment occurs after installation when the actual number of miles of fiber under the actual route used can be calculated.

 Upon reviewing the provisions of a written contract, our goal is to determine the intent of the parties at the time of execution as revealed by the language they chose in expressing their rights and responsibilities. *Jacobs v. Hilliard,* 829 N.E.2d 629, 632 (Ind.Ct.App.2005), *trans. denied.* If the contract language is clear and unambiguous, we will give the language its plain and ordinary meaning. *Fairway Developers, Inc. v. Marcum,* 832 N.E.2d 581, 584 (Ind.Ct.App.2005), *trans. denied.* Only when the meaning of the contract cannot be gleaned from the four corners of the instrument, does the intention of the parties become a question of fact and resort to extrinsic evidence proper. *Jacobs,* 829 N.E.2d at 633. In a similar light, evidence of industry practice is only admissible to construe terms of art or ambiguous agreements. *Allstate Ins. Co. v. Dana Corp.,* 759 N.E.2d 1049, 1059 (Ind. 2001).

Here, the Southern Hills IRU stipulates in its article VI, Terms of Payment that "[Southern Hills] shall pay [Metro] the sum of 1.5 million (1,500,000.00) U.S. dollars," followed by a detailed payment schedule. (Appellant's App. p. 227). The IRU does not include any provision for adjustment of this price. Thus, from the plain language of the contract, it is clear that the fibers were priced as a lot, not by mile, and the unambiguous intention of the parties appears to have been a fixed price. This interpretation is strengthened by review of another IRU between AEP and Metro, dated June 2, 2000, which clearly includes a price per mileage clause.[3]

---

**3.** The AEP–Metro IRU provides in Article III—Consideration:

3.1 The consideration for the[AEP] IRU in the [AEP] Fibers (the "Contract Price") shall be equal to the total Route Miles of the Cable, multiplied by thirty-six (36)[AEP] Fi-

bers, multiplied by Eight Hundred Ninety-Nine Dollars ($899.00)...

3.2 At the time [Metro] provides [AEP] the as-built drawings pursuant to Section 7.2, it shall also provide [AEP] with a written statement of the actual Route Miles and any amount to be paid by [Metro] to [AEP] or by

However, Purcell alleges that the Southern Hills IRU nevertheless raises to the level of ambiguity and therefore industry practice should be taken into account for its interpretation. In support of this argument, Purcell solely relies on the IRU's article I which states that "[Southern Hills'] Fibers will consist of *approximately* 157 miles of single mode fiber, which will be located *generally* along a route set forth in Exhibit A." (Appellant's App. p. 222) (emphasis added). Purcell's reliance on a mere two words which might be equated with inaccuracies simply do not rise to the level of ambiguity. Accordingly, mindful of our standard of review and in light of our interpretation of the contract as a whole, we find that the Southern Hills IRU clearly and unambiguously includes a fixed price. Therefore, the trial court properly refused a set-off.

## CONCLUSION

Based on the foregoing, we find that the trial court properly concluded that (1) Purcell breached his common law fiduciary duty to Southern Hills; (2) Purcell's actions on behalf of VillageNet constituted willful or reckless misconduct pursuant to Ind.Code § 23–18–4–2; (3) Southern Hills can maintain a direct action, rather than a derivative action, against Purcell; and (4) the damages awarded to Southern Hills do not need to be offset.

Affirmed.

BARNES, J., concurs.

SHARPNACK, J., concurring in result with separate opinion.

SHARPNACK, Judge, concurring in result.

While I concur fully with the majority on the other issues in this case, I concur in result only on the issue whether Purcell is entitled to set off the $288,000 paid to Southern Hills in the Metro bankruptcy proceeding. I concur in the result reached by the majority that Purcell is not entitled to the setoff claim for $288,000, but for a different reason than the majority. I disagree with the majority in that it states that "there is no evidence supporting Purcell's contention that the damages ultimately covered in the bankruptcy settlement include damages for Metro's withholding of amounts owed to VillageNet." Op. at 1003. However, while there is some evidence supporting Purcell's contention, Purcell has not met his burden under our standard of review.

In challenging the trial court's decision, Purcell confronts a stringent standard of review. Purcell bore the burden to prove a partial satisfaction of the damages claimed by Southern Hills requiring a setoff. *See Marquez v. Mayer,* 727 N.E.2d 768, 773 (Ind.Ct.App.2000), *trans. denied.* The trial court found against Purcell on this issue. Thus, Purcell appeals from a negative judgment. *Id.* Because Purcell appeals from a negative judgment, he must demonstrate that the trial court's judgment is contrary to law. *Infinity Prod., Inc. v. Quandt,* 810 N.E.2d 1028, 1031–1032 (Ind.2004), *reh'g denied.* A judgment is contrary to law only if the evidence in the record, along with all reasonable infer-

---

[AEP] to [Metro] to reflect any difference between the actual Contract Price (as computed based actual Cable Route Miles) and the estimated Contract Price. If [AEP] has already paid the remainder of the estimated Contract Price, [Metro] shall pay to [AEP] (if the amounts [AEP] paid exceed the Contract Price) or [AEP] shall pay to [Metro] (if the amounts [AEP] paid are less than the Contract Price) the difference between the estimated and the actual Contract Price within thirty (30) days of the delivery of such written statement. In no event will the actual Route Miles used in the foregoing calculation exceed one hundred ten percent (110%) of the estimated Route Miles without the prior written consent of [AEP].
(Appellant's App. pp. 122–23).

ences, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court. *Id.* at 1032. In conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and we must affirm the trial court's decision if the record contains any supporting evidence or inferences. *Id.*

There is some evidence supporting Purcell's contention that the damages ultimately covered in the bankruptcy settlement include damages for Metro's withholding of amounts owed to VillageNet. In the bankruptcy proceeding, Indiana Fiber[4] and Southern Hills reached an agreement, entitled, "SETTLEMENT AGREEMENT," which dismissed Southern Hills' bankruptcy claim and included a provision providing for a payment by Indiana Fiber of $288,000 to Southern Hills. Appellant's Appendix Vol. I at 210.

Southern Hills' claim in Metro's bankruptcy proceeding is similar to its amended complaint in this case. Southern Hills described its claim in the bankruptcy proceeding as "aris[ing] out of Metro's wrongful withholding of amounts owed to VillagNet [sic] Services, LLC." *Id.* at 218. Southern Hills' amended complaint states, in part, "Metro failed to pay VillageNet what it was entitled to receive from the payments made by AEP." *Id.* at 39.

Further, Southern Hills' bankruptcy claim and its amended complaint in this case also share similar amounts. In the Metro bankruptcy proceeding, Southern Hills filed a proof of claim in the amount of $555,810.34. (Appellant's Appendix Vol. I at 217) The amended complaint states that "[a]s a direct result of Purcell's breaches of fiduciary duties, Southern Hills sustained damages of $555,810.54." *Id.* at 40. Kent Rodgers, the CFO of Smithville Telephone, characterized the twenty-cent dif-

ference between the amounts as a "typo." Transcript Vol. II at 458–459.

Although some evidence exists that the $288,000 constituted a partial payment of the $555,810.54 claim, there is also evidence that the $288,000 could be for other things. The settlement agreement states, in part:

1. Upon the closing on the sale of substantially all of Metro's assets to Indiana Fiber ("Closing"), Indiana Fiber agrees not to pursue its rights to payment from Southern Hills of that certain account receivable listed as payable from Southern Hills to Metro and more fully described on Schedule 2.1 of the APA;

2. Indiana Fiber agrees to pay the sum of Two Hundred Eighty–Eight Thousand Dollars ($288,000) to Southern Hills ("Settlement Payment") as follows:

 (a) One Hundred Sixty–Six Thousand Dollars ($166,000) paid on or before December 10, 2002;

 (b) One Hundred Twenty–Two Thousand Dollars ($122,000.00) ("Deferred Payment") payable:

 (i) from November 19, 2002 through the earlier of full payment of the Deferred Payment or November 19, 2004, by the proceeds from an increase of Southern Hills' percentage under the March 24, 2000 VillageNet Operating Agreement from 50% to 70%, with the excess over 50% reducing the amount payable;

 (ii) through Southern Hills' election through November 19, 2004 to apply all or part of the amount payable to purchase from Indiana Fiber indefeasible rights to use in a maximum of four strands of fiber with

4. Indiana Fiber was to acquire Metro's assets in the bankruptcy proceeding.

such fiber not to be resold by Southern Hills, from Indiana Fiber, at an agreed price of Four Hundred Eight–Five Dollars ($485.00) per optical mile as measured by an Optical Time Domaine Reflectometer ("Agreed Mileage Price");

(c) In the event that Southern Hills does not receive the entire Deferred Payment by November 19, 2004, Southern Hills may purchase from Indiana Fiber indefeasible rights to use in a maximum of four strands of fiber with such fiber not to be resold by Southern Hills from Indiana Fiber at the Agreed Mileage Price up to the total amount of the unpaid balance provided that the indefeasible rights to use purchased would be purchased by November 19, 2004;

Notwithstanding the preceding provisions, Southern Hills may, through November 19, 2004, purchase from Indiana Fiber available indefeasible rights to use in a maximum of four strands of fiber with such fiber not to be resold by Southern Hills at the Agreed Mileage Price and, in its sole election, determine whether such purchase will be applied to the Deferred Payment.

\* \* \* \* \*

4. Southern Hills, on behalf of itself and on behalf of VillageNet, agrees that the Adversary Proceeding will be dismissed with prejudice as to Metro, which dismissal will be without prejudice to the right of Southern Hills, on behalf of itself and on behalf of VillageNet, to pursue claims against Andrew Purcell, which claims are expressly reserved, and that any and all liens, claims, and encumbrances including all UCC filings and utility mortgages, Southern Hills has asserted or may assert in and against the assets of Metro in the "Southern Loop" on behalf of itself or on behalf of VillageNet, are released and forever discharged, and that Southern Hills and VillageNet become general unsecured creditors of Metro.

\* \* \* \* \*

6. Southern Hills, in its own and in its capacity as a member of VillageNet, expressly and without reservation consents to the assignment by Metro of all of Metro's membership interests in VillageNet under the VillageNet Operating Agreement and upon Closing unreservedly accepts Indiana Fiber as a fully participating member in VillageNet as provided under the VillageNet Operating Agreement with all voting and other rights and privileges thereto;

7. VillageNet agrees to release to Metro its indefeasible right of use in twelve dark optical fibers in the Southern Loop, such release to be effective only upon the execution by Metro of that certain Agreement by and between Metro and Cinergy Networks, LLC ("Cinergy") under which Cinergy will provide maintenance services to among others, the facilities within the Southern Loop;

\* \* \* \* \*

Appellant's Appendix Vol. I at 210–212. Based on the settlement agreement the $288,000 could relate to the bankruptcy claim of Southern Hills, the release of Southern Hills' claims against Metro assets in the "Southern Loop," the consent by Southern Hills to the assignment of Metro's interest in VillageNet to Indiana Fiber, or the release by VillageNet to Metro of VillageNet's indefeasible right to use of twelve dark optical fibers in the Southern Loop, or some combination of those

items. There is no evidence on which an allocation of the $288,000 can be made.

While there is some evidence supporting Purcell's contention, I cannot say that the evidence in the record is without conflict and leads unerringly to a conclusion opposite that reached by the trial court and the trial court's judgment is contrary to law. *See, e.g., Infinity Products, Inc.,* 810 N.E.2d at 1033 (holding that the trial court's judgment was not contrary to law); *Marquez,* 727 N.E.2d at 775 (holding that "we cannot say that the trial court erred as a matter of law in denying [defendant]'s request for a set off").